MOBILE DIAGNOSTIC GROUP HOLDINGS, LLC, Mobile Diagnostic Intermediate Holdings, Inc., Diagnostic Labs Holdings, LLC and Kan–Di–Ki, LLC, Plaintiffs,

v.

Robert SUER, Defendant.

Civil Action No. 4298–CC.

Court of Chancery of Delaware.

Submitted: Feb. 20, 2009.
Decided: March 24, 2009.

Christian Douglas Wright and James P. Hughes, Jr., of Young Conaway Stargatt & Taylor, LLP, Wilmington; Of Counsel: Richard D. Batchelder, Jr., Robert B. Gordon, Candace M. Brown, and Jason S. Freedman, of Ropes & Gray, LLP, Boston, MA, for plaintiffs.

Jennifer C. Jauffret, Lori A. Brewington, and Michelle Whalen, of Richards, Layton & Finger, P.A., Wilmington; Of Counsel: Marvin Bartel, of Bartel & Evans, LLP, Newport Beach, CA, for defendant.

## OPINION

CHANDLER, Chancellor.

This is an action seeking to enforce the terms of non-competition covenants that defendant allegedly agreed to in connection with the sale of his employer to plaintiffs. Plaintiffs moved for an order expediting proceedings, and defendant responded by moving to dismiss for lack of personal jurisdiction. Plaintiffs have failed to meet their burden of showing that there is a statutory basis for personal jurisdiction over the defendant in Delaware or that the defendant consented to personal jurisdiction in this State. Accordingly and for the reasons set forth below, I conclude that this action should be dismissed for lack of personal jurisdiction.

## I. BACKGROUND

Plaintiff Kan–Di–Ki, LLC ("Kan–Di–Ki," or the "Company"), formerly known as Kan–Di–Ki Incorporated, is a provider of mobile diagnostic laboratory and x-ray services. Kan–Di–Ki is a California limited liability company and, prior to its conversion to a limited liability company, was a California corporation. Kan–Di–Ki is a wholly-owned subsidiary of Diagnostic Labs, LLC ("DL Holdings"), a Delaware limited liability company. DL Holdings is a wholly-owned subsidiary of Mobile Diagnostic Intermediate Holdings, Inc. ("Intermediate"), a Delaware corporation. Intermediate is a wholly-owned subsidiary of Mobile Diagnostic Group Holdings, LLC ("MDGH"), a Delaware limited liability company. DL Holdings, Intermediate,

and MDGH are also plaintiffs in this action. Plaintiffs were created by affiliates of Audax Management Company, LLC and Frazier Management, LLC (together, the "Sponsors").

Defendant Robert Suer is a sales professional with more than ten years experience in the portable laboratory and x-ray industry. Suer joined Kan–Di–Ki's sales force in 1996 and, according to plaintiffs, managed the Company's customer relationships and developed goodwill with nearly all of the Company's existing and prospective customers. On or around June 6, 2007, Suer left Kan–Di–Ki and thereafter began his own business, Reliable Mobile Medical Services, Inc. ("Reliable").

In late August 2007, apparently concerned by the impact on Kan–Di–Ki of Suer's new business, Kan–Di–Ki purchased all of Reliable's assets for more than $2 million. In connection with this purchase, the Company entered into an employment agreement with Suer (the "Employment Agreement"), pursuant to which Suer assumed a high level position at Kan–Di–Ki.[1] The Employment Agreement also provided that in the event the Company was sold during Suer's employment with the Company, Suer would be entitled to receive an amount equal to 10% of the net proceeds payable to Jason Liu, M.D. ("Dr. Liu") or any other person or entity that is a shareholder of the Company immediately prior to the sale.[2] The

Employment Agreement provides that the Company warrants and represents that Dr. Liu is the sole shareholder of the Company and serves as its chief executive officer.[3] Plaintiffs do not allege that the Employment Agreement contains any restrictive covenants regarding Suer's right to compete with the Company after its sale.

Around early 2008, certain of the plaintiffs began negotiating a potential purchase of Kan–Di–Ki, which led to the signing of a Contribution and Equity Interest Purchase Agreement dated July 28, 2008 (the "Purchase Agreement"). The Purchase Agreement was entered into by MDGH, DL Holdings, Dr. Liu (on behalf of Kan–Di–Ki and himself), and Suer.[4] As was contemplated in the Employment Agreement, Suer received a payment upon the sale of the Company. According to plaintiffs, Suer received a total of $4 million under the terms of the Purchase Agreement. On July 28, plaintiff DL Holdings and Suer entered into a Consulting Agreement whereby Suer became a consultant to the Company with a base salary of $125,000 per year. The non-competition covenants that plaintiffs are seeking to enforce are contained in the Purchase Agreement.

Plaintiffs allege that Suer was involved in negotiations with the Sponsors and their representative regarding the Purchase

---

**1.** Plaintiffs allege that Suer was the acting Chief Operating Officer and Head of Sales of the Company. Pls.' Answering Br. in Opp'n to Def.'s Mot. to Dismiss ("Pls.' Answering Br.") at 3–4. Defendant claims that although he may have had a title that suggested he held a senior position in the Company, he actually did not act in the capacity of a senior executive officer because, for example, he did not have access to material financial information about the Company and had no express or implied authority to sign checks on behalf of the Company.

**2.** Employment Agreement § 10. Plaintiffs also allege that the Employment Agreement included a buy-out clause authorizing the Company to terminate the contract for the price of $3 million.

**3.** Employment Agreement § 7(b).

**4.** MDGH and DL Holdings were previously known as DL Group Holdings, LLC and Diagnostic Labs, LLC, respectively.

Agreement. Specifically, plaintiffs allege that from around April 2008 to July 2008, Suer contacted the Sponsors' representatives and plaintiffs multiple times and participated in negotiations regarding (1) the possibility of obtaining a position with the Company after the sale, (2) what Suer believed he was entitled to under the Employment Agreement, (3) the conditions under which Suer would enter into non-competition covenants, and (4) the content of those covenants.[5]

Plaintiff DL Holdings terminated Suer on November 6, 2008, but has continued to pay Suer under the terms of the Consulting Agreement. Suer consulted a lawyer regarding his obligations under the Purchase Agreement, and in a letter dated January 13, 2009, Suer's attorneys notified plaintiffs that they intended to advise Suer that he was not bound by the non-competition covenants in the Purchase Agreement.

■ Plaintiffs initiated this action by filing a complaint and a motion to expedite proceedings on January 16, 2009. Plaintiffs filed an Amended Verified Complaint (the "Complaint") on January 21. On January 22, defendant filed his opposition to the motion to expedite, arguing, among other things, that this Court does not have personal jurisdiction over him.[6] During the January 23 telephonic hearing held on plaintiffs' motion to expedite, defendant's counsel confirmed that defendant was asking the Court to dismiss the Complaint for lack of personal jurisdiction. The Court indicated that it would consider defendant's opposition to the motion to expedite as a motion to dismiss for lack of personal jurisdiction and set a briefing schedule for the motion.[7] This is my decision on the motion to dismiss under Court of Chancery Rule 12(b)(2).

## II. DISCUSSION

### A. The Legal Standard for Personal Jurisdiction

"A plaintiff bears the burden of showing a basis for a trial court's exercise of jurisdiction over a nonresident defendant."[8] Although the plaintiff must plead specific facts and cannot rely on mere conclusory assertions, the factual record is read in the light most favorable to the plaintiff.[9] As this motion is decided based on the Complaint and affidavits, the plaintiff need only

---

5. Pls.' Answering Br. at 4–6. Plaintiffs also allege that Suer participated in a presentation to lenders in February 2008 regarding the sale of Kan–Di–Ki. The parties have submitted conflicting affidavits regarding this presentation and Suer's other involvement in the negotiations. I am required at this stage of the proceedings to read the factual record in the light most favorable to plaintiffs.

6. Suer states that he brings his challenge to personal jurisdiction without waiving his right to file a motion to dismiss on other applicable grounds.

7. On February 6, plaintiffs filed their answering brief in opposition to defendant's motion to dismiss for lack of personal jurisdiction. On February 13, defendant filed his reply in support of the motion to dismiss.

On February 19, plaintiffs filed a sur-reply in further opposition to the motion to dismiss. On February 20, defendant moved to strike the sur-reply on grounds that neither the briefing schedule nor rules of this Court authorize or permit the filing of a sur-reply without permission of the Court. Plaintiffs have not opposed the motion to strike, and I am convinced that the sur-reply is improper. Accordingly, defendant's motion to strike plaintiffs' sur-reply and the accompanying affidavits of Jason S. Freedman and Joel A. Russ is granted.

8. *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 (Del.2005).

9. *Sprint Nextel Corp. v. iPCS, Inc.*, C.A. No. 3746–VCP, 2008 WL 2737409, at *5 (Del.Ch. July 14, 2008).

make out a *prima facie* case.[10]

The court applies a two-prong analysis in determining whether a plaintiff has satisfied the burden of showing a basis for personal jurisdiction in this State over a nonresident defendant.[11] First, the Court considers whether there is a basis for jurisdiction under Delaware's long-arm statute, 10 *Del. C.* § 3104. Second, the court must "evaluate whether subjecting the nonresident to jurisdiction in Delaware violates the Due Process Clause of the Fourteenth Amendment (the so-called 'minimum contacts' requirement)."[12] Plaintiffs contend that Suer consented to jurisdiction in Delaware with respect to claims arising out of the Purchase Agreement, that Suer is subject to personal jurisdiction under § 3104(c)(1), and that an exercise of jurisdiction over Suer in Delaware would not violate the Due Process Clause.

### B. Consent

■ The defense of lack of personal jurisdiction is a personal right that can be obviated by express or implied consent to jurisdiction.[13] Plaintiffs point to no express waiver by Suer of the defense of personal jurisdiction. Instead, plaintiffs argue that Suer impliedly consented to jurisdiction in Delaware when he agreed to the service of process provision in the Purchase Agreement. That provision provides that each party may be served with process in any manner permitted under Delaware law or by registered or certified mail, return receipt requested, sent to an address specified in another provision of the Purchase Agreement.

Plaintiffs rely on *Hovde Acquisition, LLC v. Thomas*[14] and *Chrysler Capital Corp. v. Woehling*[15] to support their argument. In *Hovde*, the Court held that by expressly consenting to jurisdiction, the defendant also consented to service of process in a manner consistent with Delaware law.[16] To hold otherwise, the *Hovde* Court reasoned, would render the consent to jurisdiction useless.[17] Similarly, in *Chrysler*, the Court held that a party impliedly consented to venue by expressly consenting to jurisdiction because without the venue term the express consent to jurisdiction would be useless.[18] Plaintiffs state that the present case presents "*Hovde's* inverse" and argue that the Court should find implied consent to jurisdiction because the contract contains "a contractual provision that does not make sense without implication of another to make it effective."[19]

This argument fails because the service of process provision in the Purchase Agreement is an independent and separate provision, not rendered superfluous by a lack of consent to jurisdiction in Delaware. The provision still has meaning and force if the parties are not subject to jurisdiction in Delaware: it specifies that process may be properly served in any manner permissible under Delaware law or, in some circumstances, by registered or certified mail. Thus, the parties have waived their

---

10. *Hart Holding Co. v. Drexel Burnham Lambert Inc.*, 593 A.2d 535, 539 (Del.Ch.1991).

11. *AeroGlobal*, 871 A.2d at 438.

12. *Id.*

13. *Sternberg v. O'Neil*, 550 A.2d 1105, 1109 (Del.1988); *Sprint Nextel*, 2008 WL 2737409, at *6.

14. 2002 WL 1271681 (Del.Ch. June 5, 2002).

15. 663 F.Supp. 478 (D.Del.1987).

16. *Hovde*, 2002 WL 1271681, at *4.

17. *Id.*

18. *Chrysler*, 663 F.Supp. at 481.

19. Pls.' Answering Br. at 11.

right to allege improper service of process if properly served by one of these methods. As plaintiffs admit, service of process requirements vary by state. Thus, for example, if plaintiffs had sued Suer in California, plaintiffs would argue that Suer waived his right to complain if plaintiffs served him with process in a manner consistent with Delaware law, yet prohibited by California law.

Plaintiffs' consent argument is further belied by § 12.12 of the Purchase Agreement, which provides that:

> each of the parties agrees that … the other parties will be entitled to an injunction or injunctions to prevent breaches or violations of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any Action instituted *in any court of the United States or any state thereof having jurisdiction over the parties and the matter* in addition to any other remedy to which it may be entitled, at law or in equity.[20]

Thus, rather than consenting to jurisdiction in any particular forum, the parties agreed to be subject to jurisdiction in a court "having jurisdiction over the parties and the matter." While this provision does not specify which courts would have such jurisdiction, it demonstrates that the parties contemplated the issue of jurisdiction in the contract and chose not to include a provision whereby the parties consented to personal jurisdiction in any particular forum. Rather, the parties agreed to be subject to jurisdiction in a court "having jurisdiction over the parties." Additionally, this Court is wary of finding implied consent to jurisdiction where, as here, the defendant would be impliedly consenting to litigate in a forum thousands of miles from his home.[21] For all these reasons, I cannot conclude that Suer expressly or impliedly consented to personal jurisdiction in Delaware.

### C.   The Long–Arm Statute

▪ Under Delaware's long-arm statute, Delaware courts can exercise personal jurisdiction over a defendant for a claim that "arises from" a "jurisdictional act" enumerated in the statute.[22] Plaintiffs argue that Suer is subject to specific jurisdiction under § 3104(c)(1), which confers jurisdiction over a nonresident who "[t]ransacts any business or performs any character of work or service in the State."[23] In order for this Court to exercise jurisdiction under § 3104(c)(1), "some act must actually occur in Delaware."[24] Additionally, the claims must "have a nexus to [the] forum-related conduct."[25] The long-arm statute is to be construed as broadly as permitted under the Due Process Clause; however, courts should also be "careful not to 'break[ ] the necessary connection between statutory words and common usage of the English language.' "[26]

**20.** Purchase Agreement § 12.12 (emphasis added).

**21.** Unlike here, the defendants in both *Hovde* and *Chrysler* had expressly consented to jurisdiction in Delaware and thus should have reasonably anticipated being sued in Delaware. *Hovde*, 2002 WL 1271681, at *4; *Chrysler*, 663 F.Supp. at 481.

**22.** *Sprint Nextel*, 2008 WL 2737409, at *8.

**23.** 10 *Del. C.* § 3104(c)(1).

**24.** *Kelly v. McKesson HBOC, Inc.*, 2002 WL 88939, at *17 (Del.Super.Jan.17, 2002) (quoting *TriStrata Tech., Inc. v. Neoteric Cosmetics, Inc.*, 961 F.Supp. 686, 690 (D.Del.1997)).

**25.** *Sprint Nextel*, 2008 WL 2737409, at *8 (quoting *Cornerstone Techs., LLC. v. Conrad*, 2003 WL 1787959, at *9 (Del.Ch. Mar. 31, 2003)).

**26.** *Sprint Nextel*, 2008 WL 2737409, at *6 (quoting *Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods., Inc.*, C.A. No.

■ Plaintiffs argue that § 3104(c)(1) confers jurisdiction over Suer because Suer signed and participated in negotiations regarding the Purchase Agreement. Plaintiffs do not allege that the contract was signed by Suer in Delaware or that Suer participated in any negotiations in Delaware. It is well settled law that "a contract between a Delaware corporation and a nonresident to . . . transact business outside Delaware, which has been negotiated without any contacts with this State, cannot alone serve as a basis for personal jurisdiction over the nonresident for actions arising out of that contract."[27] It is also well established that a choice of Delaware law provision in a contract is not, of itself, a sufficient transaction of business in the State to confer jurisdiction under (c)(1). This principle was made clear in *Intellimark, Inc. v. Rowe* when the Court there held that the nonresident defendants' signatures on a promissory note, which contained a Delaware choice of law provision, were not a sufficient transaction of business in this State to confer jurisdiction.[28] Similarly, agreeing to a provision in a contract that provides for service of process by any means permitted under Delaware law is not a jurisdiction-conferring act within this State. Thus, agreeing to the choice of law provision and the service of process provision in the Purchase Agreement did not constitute a transaction of business by Suer in Delaware within the meaning of § 3104(c)(1).

Recognizing this well established law, plaintiffs seek to have the Court extend the holding of *In re General Motors (Hughes) Shareholder Litigation.*[29] In *General Motors,* this Court found jurisdiction proper where the defendant, a South Australian corporation that was the parent company of three Delaware entities,[30] "negotiat[ed] and engag[ed] in a transaction between itself, an indirect Delaware subsidiary . . . and another Delaware corporation . . . in which Delaware law was to be applied" and the transaction included "necessary acts by the parties in furtherance of that transaction [which] would be taken in Delaware."[31] The defendant in *General Motors* actively engaged in negotiating and structuring a transaction that required the filing of a Certificate of Merger in Delaware.[32] The board of directors of the defendant company approved and adopted the merger agreement.[33] In finding a ba-

---

12036, 1991 WL 129174, at *2 (Del.Ch. July 10, 1991)); *see Joint Stock Soc'y v. Heublein, Inc.,* 936 F.Supp. 177, 194 (D.Del.1996) ("[T]he court cannot ignore the strict language of Delaware's long-arm statute requiring that the defendant perform a tortious act 'in Delaware.' "); *Ramada Inns, Inc. v. Drinkhall,* 1984 WL 247023, at *2 (Del.Super. May 17, 1984) ("Where qualifying language is used, the Court should not ignore that language out of a desire to afford maximum jurisdictional coverage.").

27. *Newspan, Inc. v. Hearthstone Funding Corp.,* C.A. No. 13304, 1994 WL 198721, at *6 (Del.Ch. May 10, 1994); *see Abajian v. Kennedy,* C.A. No. 11425, 1992 WL 8794, at *10 (Del.Ch. Jan. 17, 1992) ("It is well established law that merely contracting with an entity that is incorporated within a forum state does not provide necessary connections between

the contract and the forum to support a finding of jurisdiction.").

28. *Intellimark,* 2005 WL 2739500, at *2–3; *see also Summit Investors II, L.P. v. Sechrist Indus., Inc.,* 2002 WL 31260989, at *4 (Del. Ch. Sept. 20, 2002) (holding that a Delaware choice of law provision is insufficient to satisfy the Constitutional minimum contacts test).

29. C.A. No. 20269, 2005 WL 1089021 (Del. Ch. May 4, 2005).

30. *Id.* at *1 nn. 1, 22.

31. *Id.* at *23.

32. *Id.* at *22–23.

33. *Id.* at *22.

sis for jurisdiction, the Court reasoned that "Delaware has an interest in ensuring that boards of directors of Delaware corporations fulfill their fiduciary duties, an interest that would be undermined if entities that allegedly aid and abet breaches of fiduciary duties of Delaware corporations could not be held accountable in Delaware courts."[34]

The defendant challenging jurisdiction in *General Motors* was The News Corporation Limited ("News"). In the transaction at issue, News negotiated and participated in structuring a transaction whereby it would pay a total of $4.1 billion in compensation to General Motors Corporation ("GM") in exchange for an interest in Hughes Electronics Corporation ("Hughes"), a Delaware corporation that was previously a wholly-owned subsidiary of GM.[35] Plaintiffs were holders of GM's Class H Common Stock ("GMH"), which was a "tracking stock" representing the financial performance of Hughes while Hughes was wholly-owned by GM.[36] Plaintiffs were challenging the actions that GM, its board, and News took as part of this transaction. News was a principal player in the transaction, which the Court described as follows:

> GM, as the 100% shareholder, caused Hughes to amend its certificate of incorporation to increase the number of authorized shares of Hughes common stock and Hughes Class B common stock from 1 million shares to 2.5 billion shares. An "excess shares" provision was added to the certificate of incorporation and Hughes' board was staggered, among other amendments.
>
> Just before the split-off of Hughes was accomplished, Hughes paid a special dividend to its sole shareholder, GM, of $275 million in cash. The split-off occurred by GM's redemption of each GMH share in exchange for one share of Hughes' common stock, shares which Hughes had previously issued to GM. GM sold its economic interest in Hughes to News Corp. in the form of Hughes Class B common stock. GM received a combination of cash ($3.1 billion) and stock (28.6 million News Corp. Preferred American Depository Shares ("News ADSs")) from News. The News ADSs were valued at approximately $1.0 billion, bringing the total compensation from News to GM to $4.1 billion. Including the $275 million dividend, GM received a total of $4.375 billion in compensation for divesting itself of Hughes, with $3.375 billion of that amount in cash.
>
> Immediately following the above-described transactions, News acquired an additional interest in Hughes via the merger of a subsidiary of News into Hughes (the "Merger"), leaving News with approximately a 34% interest in Hughes. The former GMH shareholders therefore received a combination of Hughes common stock and News ADSs in exchange for their GMH shares. News later transferred its interest in Hughes to another subsidiary of News Corp., Fox Entertainment.[37]

The completion of this transaction required that a Certificate of Merger be filed in Delaware.[38] The plaintiffs in *General Motors* alleged that GM and its directors breached the fiduciary duties they owed to the GMH shareholders by negotiating, structuring, and effecting this trans-

---

34. *Id.* at *23.

35. *Id.* at *1–2, 22.

36. *Id.* at *1.

37. *Id.* at *2 (footnotes omitted).

38. *Id.* at *22.

action and that News aided and abetted these breaches through its conduct in negotiating and structuring the transaction.[39] It was in this context that the Court determined that Delaware's interest in providing a forum for claims regarding the internal affairs of Delaware corporations justified concluding that the relatively minor act of filing the Certificate of Merger in Delaware constituted a basis for personal jurisdiction in this State.

■ In the instant case, plaintiffs contend that the creation of the entities that the Sponsors used to acquire the Company constituted a jurisdiction-conferring act in this State. Even when viewed in the light most favorable to plaintiffs, however, the facts in this case stand in contrast to the facts in *General Motors* and do not constitute a sufficient basis for personal jurisdiction over Suer in Delaware. Even accepting as true plaintiffs' allegations that Suer was involved in negotiating some portions of the Purchase Agreement, his involvement with the Purchase Agreement and his connection to the alleged jurisdiction-conferring act in this State are not sufficient to support the conclusion that Suer transacted business in this State within the meaning of § 3104(c)(1). To hold otherwise would constitute an unwarranted extension of the holding in *General Motors* for the following reasons.

Most importantly, unlike the claims here, the claims in *General Motors* implicated Delaware's strong interest—indeed "obligation"—to provide a forum for claims involving the internal affairs of domestic corporations. Delaware has a strong interest in providing a forum in this State to address breaches of fiduciary duties owed to Delaware corporations and, by logical extension, in providing a forum for claims for aiding and abetting breaches of those fiduciary duties. As the Delaware Supreme Court has stated, "Delaware has more than an interest in providing a sure forum for shareholder derivative litigation involving the internal affairs of its domestic corporations. Delaware has an obligation to provide such a forum."[40]

The Court in *General Motors* noted Delaware's strong interest in providing such a forum and, in holding that the exercise of jurisdiction over News was proper, reasoned that this interest "would be undermined if entities that allegedly aid and abet breaches of fiduciary duties of Delaware corporations could not be held accountable in Delaware courts."[41] This obligation to provide such a forum informed the *General Motors* Court's decision to hold that even a relatively small act in Delaware by someone other than the defendant could provide a basis for personal jurisdiction under § 3104(c)(1). In the instant case, in contrast, plaintiffs are asserting a claim for *breach of a contract* that plaintiffs entered into with a *California resident* who signed the contract *in California*. Accordingly, Delaware's strong interest in providing a forum for claims involving the internal affairs of domestic corporations is not implicated in this case.

Also, unlike in *General Motors*, plaintiffs here have failed to establish a sufficient connection between the defendant and the alleged jurisdiction-conferring act in this State. In *General Motors*, News engaged in a complex transaction whereby it ac-

---

39. *Id.* at *2–6.

40. *Sternberg v. O'Neil,* 550 A.2d 1105, 1125 (Del.1988) (citation omitted); *see Armstrong v. Pomerance,* 423 A.2d 174, 177 & n. 6 (Del. 1980) (noting that a strong interest of a state in providing a forum may make the exercise of jurisdiction constitutional even if the defendant's contacts are minimal).

41. *General Motors,* 2005 WL 1089021, at *23.

quired a substantial interest in a Delaware entity—a transaction that, as News was aware, required the filing of the Certificate of Merger in Delaware. The claims against News arose out of the actions News took in negotiating and structuring this transaction.[42] Here, in contrast, plaintiffs have failed to allege facts that show that Suer was a party to the decision by the Sponsors to create a Delaware entity or that Suer in any way participated in such decision. The only jurisdictional "hook" on which plaintiffs attempt to base jurisdiction is that the Sponsors created Delaware entities to consummate the transaction and then caused those entities to enter into a contract with Suer. As I have already said, it is well settled law that entering into a contract with a Delaware entity is not a sufficient jurisdiction conferring act within this State.[43] This is not changed by the fact that the Sponsors created Delaware entities to consummate the transaction. This strained connection between Suer and Delaware is not enough for this Court to conclude that plaintiffs' claims arise from a transaction of business by Suer in Delaware.[44] That plaintiffs (or the Sponsors) chose to consummate the transaction using Delaware entities does not constitute an act in Delaware by Suer that would subject him to personal jurisdiction under the long-arm statute.

Additionally, Suer was much less involved in negotiating and structuring the transaction at issue in this case than was News in negotiating and structuring the transaction in *General Motors*. Suer was a sales professional employed by Kan–Di–Ki prior to its acquisition by plaintiffs. Pursuant to the Employment Agreement between Suer and Kan–Di–Ki, Suer was entitled to a percentage of any proceeds paid to Dr. Liu (or any other person who was a shareholder of the Company) upon a sale of the Company. When the Sponsors approached Dr. Liu about a potential acquisition of the Company, Suer was concerned about the effect the acquisition might have on his future employment and his rights under the Employment Agreement. Plaintiffs allege that Suer repeatedly initiated contact with and participated in negotiations with the Sponsors' representatives regarding (1) the compensation he believed he was entitled to as a result of the sale and pursuant to the Employment Agreement, (2) the possibility of obtaining employment with the Company after the sale, and (3) the terms of any non-competition provisions and the conditions under which Suer would agree to them. Thus, even taking the facts in the light most favorable to plaintiffs, Suer's limited involvement in negotiating and structuring the transaction in this case

42. For example, the plaintiffs in *General Motors* challenged the fairness of the consideration they received in the Hughes transaction and the process by which the transaction was negotiated and structured. The plaintiffs claimed: (1) that the premium the GMH shareholders would receive was less than was represented because announcement of the merger was strategically timed before two announcements that would substantially raise the price of GMH shares, (2) "that an extra dollar per share was added to the special dividend paid by Hughes to GM as a result of News' agreement to reduce the amount of Hughes stock it would acquire from 36 percent to 34 percent, and that this reduction resulted in a material reduction of compensa-

tion to be paid to the GMH shareholders," (3) that the process underlying the transaction was flawed because the GM board delegated to management of GM and the management and board of Hughes the responsibility to negotiate with News and between themselves, and (4) that each of the four financial advisors who provided fairness opinions were conflicted because they had business relationships with GM, Hughes, and/or News. *Id.* at *3–4.

43. *See Newspan*, 1994 WL 198721, at *6; *Abajian*, 1992 WL 8794, at *10.

44. 10 *Del. C.* § 3104(c)(1).

stands in contrast to the central role played by News in the transaction that led the Court to conclude that News had transacted business in Delaware and purposefully availed itself of the laws of Delaware such that it should have reasonably anticipated being haled into a Delaware Court.[45]

Suer is a California resident who was working in California. He has never resided in or even visited Delaware. He signed the Purchase Agreement in California. He did not undertake any negotiations or other acts in Delaware. In short, plaintiffs have failed to establish any act by Suer in this State that would justify an exercise of personal jurisdiction under § 3104(c)(1). Accordingly, I am unable to conclude that there is a statutory basis for personal jurisdiction over Suer in Delaware.[46]

### III. CONCLUSION

The requirement that a court have personal jurisdiction over a defendant is grounded in the laws of this State and in the United States Constitution. The burden is on the plaintiff to show that there is a proper basis for the Court to exercise personal jurisdiction over a nonresident defendant. Plaintiffs have failed to meet their burden. Although the result of the Court's decision is that plaintiffs will be unable to pursue their claims against Suer in Delaware, they are free to bring their claims in a court that has jurisdiction over the parties and the matter.[47]

For the foregoing reasons, defendant's motion to strike plaintiffs' sur-reply and defendant's motion to dismiss for lack of personal jurisdiction are hereby granted.

IT IS SO ORDERED.

**45.** The claims against News arose directly from News' conduct in effecting the transaction that required the filing of the Certificate of Merger in Delaware. Thus, News' alleged aiding and abetting of breaches of fiduciary duty were closely related to the jurisdictional act on which the Court relied in finding jurisdiction. In contrast, the claims in this case arise out of the defendant's alleged breach of a contract and not out of actions that were directly related to the alleged jurisdiction-conferring act.

**46.** Because I have found that there is not a statutory basis for jurisdiction over Suer in Delaware, I need not reach the final step of the analysis—whether this Court's exercise of jurisdiction over Suer would comport with the requirements of the Due Process Clause of the Fourteenth Amendment. If I were to reach this question, however, I would be unable to conclude that Suer purposefully directed the requisite minimum contacts toward Delaware. The sparse contacts with Delaware alleged by plaintiffs are not such that Suer should have reasonably anticipated being haled into court in Delaware. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–78, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–19, 66 S.Ct. 154, 90 L.Ed. 95; *Sternberg v. O'Neil*, 550 A.2d 1105, 1120 (Del.1988) ("[T]he minimum contacts which are necessary to establish jurisdiction must relate to some act by which the defendant has deliberately created continuing obligations between himself (itself) and the forum.").

**47.** Plaintiffs make much of the fact that Suer's attorneys have opined that the non-competition provision of the Purchase Agreement is not enforceable under California law. The contract, however, contains a choice of law provision, and plaintiffs are free to argue that a court in California (or any other state with proper jurisdiction) should apply Delaware law. Additionally, to the extent that a party wants to ensure that it can sue a nonresident in Delaware based on a contract signed by the nonresident outside of this State, it can bargain for consent to jurisdiction in the contract.