# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MATRIX PARENT, INC.; H.I.G. MOBILE, L.P.; H.I.G. EUROPE MIDDLE MARKET LBO FUND, L.P.; H.I.G. MIDDLE MARKET LBO FUND III, L.P.; H.I.G. TECHNOLOGY PARTNERS A, L.P.; H.I.G. TECHNOLOGY PARTNERS B, L.P.; AND H.I.G. MATRIX COINVESTORS, L.P., | ) ) ) ) ) ) ) ) ) ) | C.A. No. N23C-10-212 MAA CCLD |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| AUDAX MANAGEMENT COMPANY, LLC; AG MOBILE HOLDINGS, LP; AUDAX PRIVATE EQUITY FUND V-A, L.P.; AUDAX PRIVATE EQUITY FUND V-B, L.P.; AFF CO-INVEST L.P.; AUDAX TRUST CO-INVEST, L.P.; AUDAX PE V CO-INVEST, A SERIES OF AUDAX CO-INVEST SERIES, LLC; IVESHU BHATIA; DANIEL DORAN; and TIMOTHY MACK, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Submitted: March 22, 2024
Decided: June 27, 2024

*Defendants' Motion to Dismiss:*
**GRANTED in Part, and DENIED in Part.**

## OPINION

Elena C. Norman, Esquire, Daniel M. Kirshenbaum, Esquire, and Michael A. Laukaitis, II, Esquire, of YOUNG, CONAWAY, STARGATT, and TAYLOR LLP, Wilmington, DE, and Michael S. Shuster, Esquire, and Vincent Levy, Esquire, of HOLWELL SHUSTER & GOLDBERG LLP, New York, NY, *Attorneys for Plaintiffs.*

Kevin R. Shannon, Esquire, of POTTER ANDERSON & CORROON LLP, Wilmington, DE, and Kevin B. Huff, Esquire, of KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., Washington, DC, *Attorneys for Defendants*, and Michael Kendall, Esquire, of WHITE & CASE LLP, Boston, MA, *Attorneys for Defendants Iveshu Bhatia, Daniel Doran,  and Timothy Mack.*

**Adams, J.**

## INTRODUCTION

Plaintiff Matrix Parent, Inc. ("Matrix Parent"), along with Plaintiffs H.I.G. Europe Middle Market LBO Fund, L.P., H.I.G. Middle Market LBO Fund III, L.P., H.I.G. Technology Partners A, L.P., H.I.G. Technology Partners B, L.P., Matrix Co-Investors, L.P., and H.I.G. Mobile, L.P. (together, the "H.I.G. Plaintiffs," and together with Matrix Parent, "Plaintiffs"), bring this suit to recover hundreds of millions of dollars that Plaintiffs allegedly overpaid for Mobileum, Inc. ("Mobileum") and connected entities. Plaintiffs allege that Mobileum's purchase price was artificially inflated by a fraudulent scheme to overstate the growth of Mobileum's new bookings and revenue.

Plaintiffs bring their claims against Defendants Audax Management Company, LLC ("Audax"), AG Mobile Holdings, L.P., Audax Private Equity Fund V-A, L.P., Audax Private Equity Fund V-B, L.P., AFF Co-Invest, L.P., Audax Trust Co-invest, L.P., and Audax PE V Co-invest, a Series of Audax Co-Invest Series, LLC (together with Audax, the "Audax Defendants"), as well as Defendants Iveshu Bhatia, Daniel Doran, and Timothy Mack (together, the "Individual Defendants," and together with the Audax Defendants, "Defendants"). Plaintiffs allege that Defendants are accountable for the fraud because Defendants controlled Mobileum and the selling entity, Mobile Acquisition Holdings, LP ("Mobile Acquisition Holdings"), while the fraudulent scheme was carried out.

Defendants now move to dismiss Plaintiffs' Complaint. Defendants argue that the Complaint fails to state a viable claim under Superior Court Civil Rule 12(b)(6) because Plaintiffs' theories of liability are, in large part, barred by the relevant Stock Purchase Agreement (the "SPA") and are otherwise inadequately pled. Defendants also assert under Rule 12(b)(2) that this Court lacks personal jurisdiction over the Individual Defendants. Defendants alternatively move under Rule 12(f) to strike Plaintiffs' request for a jury trial because the SPA contains a provision waiving the right to the same. This is the Court's decision on these issues. For the reasons stated herein, Defendants' Motion is GRANTED in part, and DENIED in part.

## FACTS[1]

### I. THE PARTIES

#### A. Plaintiffs

Matrix Parent is the designated "Buyer" under the SPA.[2] It is a Delaware corporation with its principal place of business in New York.[3]

The H.I.G. Plaintiffs are a group of investment funds that, together, contributed $285 million towards Matrix Parent's purchase of Mobileum.[4] H.I.G.

---

[1] These facts are drawn from Plaintiffs' Complaint and the documents integral thereto. D.I. 1 (hereinafter, "Compl."). These allegations are presumed to be true solely for purposes of this Motion.

[2] *Id.* ¶ 21.

[3] *Id.*

[4] *Id.* ¶ 22.

4

Europe Middle Market LBO Fund, L.P. is a Cayman Islands exempted limited partnership with its principal place of business in Florida.[5] H.I.G. Middle Market LBO Fund III, L.P. is a Delaware limited partnership with its principal place of business in Florida.[6] H.I.G. Technology Partners A, L.P. is a Delaware limited partnership with its principal place of business in Florida.[7] H.I.G. Technology Partners B, L.P. is a Delaware limited partnership with its principal place of business in Florida.[8] H.I.G. Matrix Co-Investors, L.P. is a Delaware limited partnership with its principal place of business in Florida.[9] H.I.G. Mobile, L.P. is a Delaware limited partnership with its principal place of business in New York.[10]

### B. Defendants

The Audax Defendants are a group of entities that indirectly owned Mobileum prior to the at-issue sale.[11] Audax is a Delaware limited liability company with its principal place of business in Massachusetts.[12] AG Mobile Holdings, L.P. is a Delaware limited partnership with its principal place of business in Massachusetts.[13] Audax Private Equity Fund V-A, LP is a Delaware limited partnership with its

---

[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.* ¶ 24.
[12] *Id.*
[13] *Id.*

principal place of business in Massachusetts.[14]  Audax Private Equity Fund V-B, LP is a Delaware limited partnership with its principal place of business in Massachusetts.[15]  AFF Co-Invest LP is a Delaware limited partnership with its principal place of business in Massachusetts.[16]  Audax Trust Co-invest LP is a Delaware limited partnership with its principal place of business in Massachusetts.[17]  Audax PE V Co-invest, a Series of Audax Co-Invest Series, LLC is a Delaware limited liability company with its principal place of business in Massachusetts.[18]

The Individual Defendants—Bhatia, Doran, and Mack—are natural persons affiliated with the Audax Defendants and employed by Audax.[19]  Each of the Individual Defendants is a Massachusetts resident.[20]

### C. Relevant Non-Parties

Mobile Acquisition Holdings is the designated "Seller" under the SPA.[21] Mobile Acquisition Holdings directly owned Mobile Acquisition Corp.[22]  Mobile Acquisition Corp. directly owned Mobileum.[23]  Mobile Acquisition Corp. is the designated "Company" under the SPA, but Mobileum was the principal operating

---

[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.* ¶ 26.
[20] *Id.*
[21] *Id.* ¶ 25.
[22] *Id.* ¶ 47.
[23] *Id.*

company.[24]  Plaintiffs allege that Mobile Acquisition Holdings is a shell company controlled by the Audax Defendants.[25]

Andrew Warner was Mobileum's Chief Financial Officer and a member of Mobileum's Board at all relevant times.[26]  Plaintiffs allege that Warner was also Audax's employee and the Audax Defendants' agent for purposes of managing Mobileum.[27]

Orathi "Bobby" Srinivasan co-founded Mobileum.[28]  Srinivasan was Mobileum's Chief Executive Officer and a member of Mobileum's Board at all relevant times.[29]

## II.    THE SALE OF MOBILEUM

Mobileum provides a suite of services to mobile-network providers and other telecommunications companies.[30]  Audax is a private equity firm that acquires, grows, and then resells portfolio companies.[31]  In November 2016, Audax acquired Mobileum.[32]  Audax kept Srinivasan in place as Mobileum's CEO, but installed

---

[24] *Id.* ¶¶ 47–48.
[25] *Id.* ¶ 25.
[26] *Id.* ¶ 28.
[27] *Id.*
[28] *Id.* ¶ 36.
[29] *Id.* ¶ 29.
[30] *Id.* ¶ 34.
[31] *Id.* ¶ 35.
[32] *Id.* ¶ 36.

7

Warner as Mobileum's new CFO.[33]  Plaintiffs allege that Audax had twice before placed Warner in an executive role at a portfolio company.[34]

From 2017 to 2020, Mobileum—under Audax's control—acquired six new companies.[35]  Then, in late 2020, Audax put the augmented Mobileum up for sale.[36]  Mobileum retained Jefferies LLC ("Jeffries") to serve as a financial advisor and to market Mobileum.[37]  In September 2021, Jeffries contacted H.I.G.[38] and provided a Confidential Information Memorandum ("CIM") detailing Mobileum's financial position and projections.[39]

The CIM indicated Mobileum was financially sound and steadily growing.[40]  Most pertinent to this case, the CIM projected that Mobileum's 2021 EBITDA would reach $84 million, its revenue would grow at a rate of 15%, and its bookings would grow at a rate of 18%.[41]  Those estimates and other promising figures prompted H.I.G. to begin due diligence in late September 2021.[42]  In November

---

[33] *Id.*
[34] *Id.*
[35] *Id.* ¶ 37.
[36] *Id.*
[37] *Id.*
[38]  The Complaint does not specify which H.I.G. entity led negotiations on the buy side.  The parties' briefs likewise refer generally to "H.I.G." for this purpose.  As it does not affect any substantive issues at this stage, the Court follows suit.
[39] *Id.* ¶¶ 38–39.
[40] *Id.* ¶ 39.
[41] *Id.*
[42] *Id.* ¶ 41.

2021, H.I.G. submitted a non-binding offer valuing Mobileum (on an Enterprise Value basis) between $860 million and $920 million.[43]

The parties then engaged in "Phase 2" of due diligence.[44] During this phase, the Audax Defendants and Mobileum shared more detailed information about Mobileum with H.I.G.[45] H.I.G. retained the services of PricewaterhouseCoopers to help analyze Mobileum's financials.[46] Sold on Mobileum's potential, on December 9, 2021, H.I.G. submitted a binding offer that placed Mobileum's Enterprise Value at $890 million.[47]

Following additional diligence and negotiation, H.I.G. agreed to purchase a majority stake in Mobileum based on a "headline" Enterprise Value of $915 million.[48] Accordingly, on December 25, 2021, the parties gifted each other executed copies of the SPA.[49] The transaction closed on March 1, 2022.[50]

As for the mechanics of the transaction, H.I.G. formed Matrix Parent to be the buyer.[51] Matrix Parent then bought Mobile Acquisition Holdings' shares in Mobile

---

[43] *Id.* ¶ 42. For an explanation of Enterprise Value, *see HBK Master Fund L.P. v. Pivotal Software, Inc.*, 2023 WL 10405169, at *44 n.515 (Del. Ch. Aug. 14, 2023) (collecting sources).
[44] Compl. ¶ 43.
[45] *Id.*
[46] *Id.*
[47] *Id.* ¶ 44.
[48] *Id.* ¶ 45.
[49] *Id.* ¶ 46.
[50] *Id.*
[51] *Id.* ¶ 48.

Acquisition Corp., which directly owns Mobileum.[52]   The H.I.G. Plaintiffs contributed $285 million in cash to partially fund the purchase, and Matrix Parent covered the rest through debt.[53]   Additionally, the Audax Defendants and key members of Mobileum's management received around $141 million worth of rollover shares in Matrix Topco LP, which indirectly owns Matrix Parent.[54]

## III.   THE ALLEGED FRAUD

The crux of this case is Plaintiffs' allegation that Mobileum's attractive EBITDA, revenue growth, and bookings numbers were based on fraud and not actual business performance.  According to Plaintiffs, Mobileum's revenue was actually in decline during the relevant period and Mobileum's 2021 EBITDA was at least $20 million less than advertised.[55]  Plaintiffs highlight three "pillars" of fraud to describe the recipe Mobileum allegedly used to cook its books.

Each pillar is described more fully below but to summarize, Plaintiffs allege that, under Defendants' guidance, Mobileum:  (1) improperly accelerated its revenue recognition by acting as if it had performed more work than it had; (2) covered up its improper revenue acceleration by creating, but not sending, invoices for work that

---

[52]  *Id.*
[53]  *Id.* ¶¶ 49–50.
[54]  *Id.* ¶ 51.  Plaintiffs allege that H.I.G. insisted that the Audax Defendants retain a minority share in Mobileum.  *Id.*
[55]  *Id.* ¶ 58.

had not been done; and (3) recorded "sham" bookings from artificial entities, knowing that the bookings would not lead to revenue.

## A. Revenue Acceleration

Mobileum used the "percentage of completion" ("POC") method to account for its revenue under long-term contracts.[56] The intuitively named POC method allows a company to recognize the amount of contracted revenue that corresponds with the percentage of the contracted work that has been performed.[57] That method can be abused in two ways: overstating how much work has been done on the contract or understating how much work the contract requires. According to Plaintiffs, Mobileum did both.

Plaintiffs recite one example from the fourth quarter of 2021 in which Mobileum employees applied non-billable hours from the customer satisfaction team to billable projects, making those projects seem more complete than they truly were.[58] In another example, purchase orders dated December 22, 2021 called for 400 hours of work to be done over six months; but, less than two weeks later, 240 hours were supposedly completed—including 160 hours by an employee that Plaintiffs allege never worked on the project.[59] Emails between Mobileum

---

[56] *Id.* ¶ 62.
[57] *Id.* ¶ 63. For example, if 50% of the contracted work is completed, the company can recognize 50% of the revenue provided by the contract. *Id.*
[58] *Id.* ¶ 65.
[59] *Id.* ¶ 66.

employees suggest that this "revenue acceleration" was done to "keep the forecast" and "reach the revenue target."[60] Plaintiffs claim this type of timesheet manipulation was "pervasive" at Mobileum.[61]

Plaintiffs also allege Mobileum—led by Warner—further exploited the POC method by improperly reducing the denominator of the determinative calculation.[62] In October 2021, Warner allegedly instructed Mobileum's revenue team to reduce the numbers of hours required to be worked under a particular contract with no justification other than accelerating revenue recognition.[63]  In the third quarter of 2021, Mobileum allegedly reduced the estimated time to complete one project from 490 person-days to 81 person-days, which allowed Mobileum to record 100% completion of the project by the end of September.[64]  Despite that supposed completion, Mobileum later recorded 3,800 non-billable hours on the same project.[65] This tactic allowed Mobileum to claim a greater percentage of completion than was accurate, which led to recognizing more revenue than was appropriate.

### B. "Dummy" Invoices

An impediment to the alleged revenue acceleration scheme is the fact that customers would not welcome invoices for work that had not be performed.  That

---

[60] *Id.* ¶ 65.
[61] *Id.* ¶ 67.
[62] *Id.* ¶ 68.
[63] *Id.*
[64] *Id.* ¶ 69.
[65] *Id.*

leads to high levels of "unbilled" revenue, which can be a red flag in due diligence.[66] Indeed, unbilled revenue became a problem for Mobileum in the lead-up to the sale, growing from $6 million in 2019 to $23 million in 2021.[67] Mobileum—Warner in particular—tried to explain away the issue during due diligence by blaming accounting rules and "bureaucratic" customers.[68] But, ultimately, Mobileum allegedly took a more direct approach to confronting the accumulation of unbilled revenue.

Mobileum needed to issue invoices for the "accelerated" revenue; but it could not send customers invoices for work that had not been done. To resolve that dilemma, Warner and other Mobileum employees allegedly created "dummy" invoices, which were recorded for accounting purposes but not sent to customers.[69] Mobileum employees were told to use "a generic description like 'interim milestone'" when there was no applicable contractual milestone to invoice.[70] In early December 2021, Warner and other Mobileum executives described the creation of fictitious invoices as "an immediate priority" and a "top priority."[71]

---

[66] *Id.* ¶¶ 70–72. Unbilled revenue specifically refers to revenue that the company has recognized but has not issued an invoice to collect. *Id.* ¶ 72.

[67] *Id.* ¶ 73.

[68] *Id.* ¶ 70.

[69] *Id.* ¶ 75.

[70] *Id.* ¶ 76.

[71] *Id.* ¶¶ 75–76.

This alleged ploy had its intended effect. Mobileum's unbilled revenue began to recede—at least on paper.[72] Jeffries sent H.I.G. a document on December 15, 2021 that showed Mobileum's unbilled revenue steadily dropping.[73] That same day, Srinivasan celebrated the new numbers in an email sent to a group that included Bhatia and Doran, saying, "[f]rankly, this should be game, set and match for . . . HIG."[74] The parties executed the SPA just ten days later.[75]

### C. Illegitimate Bookings

The final pillar of the alleged fraud relates to Mobileum's efforts to show that it was growing its customer base through new bookings. Mobileum allegedly did so in at least two fraudulent ways. The first method was converting "whitespace" to actual bookings.[76] In other words, Mobileum employees recorded customer leads as if the potential customer had already committed to making a purchase.[77] Plaintiffs allege that Warner encouraged this activity and told Mobileum employees, "[t]he reality is we have a target number from Bobby [Srinivasan], then build the support that makes the number seem reasonable, but we can not [sic] say that!!"[78]

---

[72] *Id.* ¶ 78.
[73] *Id.*
[74] *Id.* (omission in original).
[75] *Id.* ¶ 46.
[76] *Id.* ¶ 80.
[77] *Id.*
[78] *Id.* (second alteration in original).

14

The second alleged method for propping up Mobileum's bookings numbers was having functionally fake companies sign up for millions of dollars' worth of services with no plan to pay for them.[79] Plaintiffs claim this was not an isolated practice, but the Complaint predominantly focuses on the example of "Kibott SARL" ("Kibott").[80] Warner—whose role as CFO did not include direct involvement with Mobileum's sales efforts—"sourced" Kibott as a customer.[81] Kibott's CEO was Warner's friend, and the two had worked together since 2019.[82] Plaintiffs allege that Mobileum and Kibott's business relationship began in June 2021, just as Mobileum's relationships with certain other customers terminated.[83] By the end of the year, Kibott had signed up for products and services worth approximately 12 million euros.[84]

Prior to December 2021, however, Kibott was not a registered limited liability company.[85] Nor did Kibott have significant assets, customers, a business plan, or even a website.[86] Kibott ultimately paid Mobileum less than 60,000 euros.[87] When Mobileum demanded more after H.I.G. took over, Kibott entered bankruptcy

---

[79] *Id.* ¶ 81.
[80] *Id.*
[81] *Id.* ¶ 82.
[82] *Id.*
[83] *Id.* ¶ 83.
[84] *Id.* ¶ 86.
[85] *Id.* ¶ 87.
[86] *Id.*
[87] *Id.* ¶ 103.

proceedings.[88]   Plaintiffs allege that Warner knew Kibott was a hollow entity throughout their dealings.[89]

Nevertheless, Kibott was a valuable partner for Mobileum while Mobileum was on the auction block.  Warner told Mobileum employees to "think of [Kibott] as a blank canvas."[90]  Accordingly, when Mobileum had problems with its revenue numbers, it repeatedly used Kibott as the solution.[91]  In one example that took place less than two weeks before the parties executed the SPA, Warner asked his Kibott go-between[92] for "another favor on the [Kibott] agreement."[93]  That "favor" was amending the relevant contract to allow Mobileum to issue invoices for 1.8 million euros, which would help Mobileum reduce its unbilled revenue balance.[94]  In response, Warner was told, "[m]issed your email last night but basically yes, go for it."[95]  Plaintiffs allege that Kibott was so accommodating because Kibott's executives received reassurances that they would not have to pay as promised.[96]

---

[88]   *Id.*
[89]   *Id.* ¶ 87.
[90]   *Id.* ¶ 92 (alteration in original).
[91]   *Id.* ¶¶ 85–102.
[92]   The Complaint refers to this intermediary as "Consultant A."  *Id.* ¶ 82.  Consultant A received "hefty" commissions for this work, which Plaintiffs allege were shared with Kibott.  *Id.* ¶ 85.
[93]   *Id.* ¶ 93 (alteration in original).
[94]   *Id.*
[95]   *Id.* (alteration in original).
[96]   *Id.* ¶ 92.

## IV. THE SPA'S RELEVANT PROVISIONS

The SPA is at the epicenter of this dispute. The SPA's terms serve as the basis for both Plaintiffs' primary claims and several of Defendants' defenses. The provisions most relevant to this Motion, in somewhat abridged form, are as follows.

### A. The Contested Representations[97]

Article IV of the SPA comprises Mobile Acquisition Corp.'s representations and warranties to Matrix Parent.[98] Plaintiffs allege that at least seven of the representations therein were false—Sections 4.05(a), 4.05(b), 4.06, 4.09(a), 4.12, 4.15(a), and 4.22(a) (together, the "Contested Representations").[99] SPA Section 4.05(a) represented in pertinent part:

> [T]he Financial Statements reflect the information set forth in the Acquired Companies' books and records and present fairly, in all material respects, the financial position, results of operations and cash flows of the Acquired Companies (taken as a whole) as of the times and for the periods referred to therein in accordance with GAAP, consistently applied throughout the periods covered thereby . . . . The Company maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded in a timely manner and as necessary to permit preparation of the Financial Statements in accordance with GAAP.

---

[97] Plaintiffs acknowledge that the terms of the SPA limit Plaintiffs' fraud claims to the express representations contained in the SPA. *See* D.I. 25 (hereinafter, "Pls.' Opp'n") at 22. The extra-contractual misrepresentations alleged in the Complaint are only offered to help demonstrate the knowing falsity of the intra-contractual misrepresentations, according to Plaintiffs. *Id.*

[98] *See* D.I. 6 (hereinafter, "Defs.' Mot."), Ex. A (hereinafter, "SPA") § 4.

[99] Compl. ¶ 55.

SPA Section 4.05(b) represented:

The Acquired Companies each maintain books and records that accurately and completely reflect in all material respects their respective assets and Liabilities. Except as set forth on Schedule 4.05(b), the Acquired Companies each maintain, adhere to and enforce internal accounting controls that are designed to provide reasonable assurance that: (i) transactions are executed only in accordance with management's authorization; (ii) transactions are recorded as necessary to permit preparation of the financial statements of the Acquired Companies in accordance with GAAP; (iii) receipts and expenditures of each Acquired Company are executed only in accordance with such management's authorization; and (iv) unauthorized acquisition, disposition or use of assets is prevented or timely detected. To the Company's knowledge, there is no weakness in the design or operation of such internal accounting controls that would reasonably be expected to adversely affect the ability of any of the Acquired Companies to initiate, record, process or report financial data.

SPA Section 4.06 represented in pertinent part: "Since the date of the Latest Balance Sheet [September 30, 2021] through the date hereof, each Acquired Company has conducted its business in the Ordinary Course of Business and there has not been any Material Adverse Effect."

SPA Section 4.09(a) represented in pertinent part: "The Acquired Companies have timely filed (taking into account any applicable extensions) all income Tax Returns and all other material Tax Returns that were required to be filed by them and such Tax Returns are true, correct, and complete in all material respects."

SPA Section 4.12 represented in pertinent part:

To the Company's knowledge, there are no facts or circumstances existing that would reasonably be expected to serve as a basis for any [defined] Claims, actions or Legal Proceedings which, if determined

18

adversely to [an] Acquired Company, would reasonably be expected to be material to the Acquired Companies, taken as a whole.

SPA Section 4.15(a) represented in pertinent part:

[E]ach of the Acquired Companies has at all times since January 1, 2018 been in compliance, and is currently in compliance in all material respects with all Laws and regulations of all Governmental Bodies applicable to such Acquired Company, its business or the ownership or use of its assets and properties.

SPA Section 4.22(a) represented in pertinent part: "The accounts receivable of each of the Acquired Companies arose from bona fide transactions entered into in the Ordinary Course of Business[.]"

## B. The Limitations on Liability

Various SPA provisions purport to allocate risk between the SPA's parties and balance their respective rights and remedies. In that regard, the SPA states:

The Parties agree that the limits imposed on Buyer's, the Company's and the other Buyer Related Parties'[100] remedies with respect to this Agreement and the transactions contemplated hereby (including this Section 9.01) were specifically bargained for between sophisticated parties and were specifically taken into account in the determination of the amounts to be paid to Seller hereunder.[101]

---

[100] The definition of "Buyer Related Parties" covers the H.I.G. Plaintiffs, stating in pertinent part, "'Buyer Related Parties' means, collectively, Buyer, its Affiliates, and their respective directors, managers, officers, employees, owners, advisors, and representatives[.]" SPA § 10.01. The definition of Affiliate, in turn, states in pertinent part, "'Affiliate' of any particular Person means any other Person controlling, controlled by, or under common control with such particular Person where 'control' means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, Contract or otherwise." Id.

[101] SPA § 9.01(b).

Defendants now raise several such provisions to defend against Plaintiffs' claims.

To start, the SPA contains provisions in which Plaintiffs broadly disclaimed reliance on any extra-contractual representations, including forecasts, projections, the CIM, and other due diligence materials or discussions.[102] Those provisions are buttressed by a similarly broad integration clause.[103] Since Plaintiffs have confirmed that they base their fraud claims solely on the falsity of express contractual representations,[104] the details of the SPA's non-reliance and integration provisions are inessential here.

SPA Section 11.17(b) contains a broad non-recourse provision that provides in pertinent part:

> This Agreement may only be enforced against, and any claim or suit or cause of action based upon, arising out of, or related to this Agreement, or the negotiation, execution or performance of this Agreement . . . (including any representation or warranty made in or in connection with this Agreement or . . . as an inducement to enter into this Agreement . . .), whether in contract or in tort, in law or in equity or otherwise, may only be brought against the express named Parties to this Agreement . . . and then only with respect to the specific obligations set forth herein . . . with respect to the named Parties to this Agreement (in all cases, as limited by the provisions of <u>Section 9.01</u>) . . . . No Person who is not an express named Party to this Agreement . . . including any past, present or future director, manager, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney, or representative of the Company, Seller or Buyer or any of their respective Affiliates (the "<u>Non-Recourse Parties</u>"), will have or be subject to any Liability or indemnification obligation (whether in

---

[102]  *Id.* §§ 11.17(a), (c).
[103]  *Id.* § 11.09.
[104]  *See supra* note 97.

Contract or in tort, in Law or in equity, based upon any theory that seeks to impose Liability of an entity part against its owners or affiliates, or otherwise) to any other Person resulting from (nor will any Person have any claim with respect to) (i) the distribution to Buyer, or Buyer's use of, or reliance on, any information, documents, projections, forecasts or other material made available to Buyer in certain "data rooms," information memorandum, management presentations or in any other form, including meetings, calls or correspondence with management of any Acquired Company or Seller or their respective Affiliates or Representatives and whether delivered to or made available prior to or after the date hereof in expectation of, or in connection with, the transactions contemplated by this Agreement, (ii) any claim based on, in respect of, or by reason of, the sale and purchase of the Acquired Companies, including any alleged non-disclosure or misrepresentations made by any such Persons, or (iii) for any obligations or Liabilities otherwise arising under, in connection with or related to this Agreement . . . or for any claim based on, in respect of, or by reason of this Agreement . . . or the negotiation or execution hereof . . . , in each case, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in Contract or tort, or whether at Law or in equity, or otherwise; and each Party irrevocably waives and releases all such Liabilities and obligations against any such Persons.

SPA Section 9.01(b) adds to the non-recourse provision by providing in pertinent part:

Each of Buyer and the Company, on its own behalf and on behalf of the other Buyer Related Parties, acknowledges and agrees that no Buyer Related Parties may avoid any limitation on liability set forth herein (including in this Section 9.01(b)) by . . . seeking damages for breach of contract, tort, or pursuant to any other theory of liability or asserting any claim against any Non-Recourse Party for conspiracy, aiding or abetting or other theory of liability with respect to a claim that may be asserted against a Party to this Agreement, all of which are hereby irrevocably waived[.]

21

Essentially, those two provisions purport to shield the "Non-Recourse Parties"—including Defendants[105]—from any liability related to the SPA, including liability for aiding and abetting or civil conspiracy.

SPA Section 9.01(b) contains an exclusive remedy provision that provides in pertinent part:

> [E]xcept . . . (iii) Retained Claims, each of Buyer and the Company hereby irrevocably waives and releases and covenants not to sue, on its own behalf and on behalf of the Buyer Related Parties, to the fullest extent permitted under applicable Law, Seller and the Non-Recourse Parties (including the other Seller Related Parties), whether in any individual, corporate, or any other capacity, from and against any and all other rights, claims, and causes of action it may have against Seller and the Non-Recourse Parties (including the other Seller Related Parties) by virtue of, or based on, the subject matter of this Agreement, the negotiation, execution, or performance of this Agreement, any Exhibit or Disclosure Schedule or other Schedule hereto, or any other document delivered pursuant to this Agreement, . . . or the ownership or operation of the Acquired Companies prior to the Closing, including whether arising under or based upon any Law or otherwise and including any rights of contribution, indemnification, reimbursement, or other similar rights, other than the Retained Claims.

As relevant here, the "Retained Claims" include "claims for Fraud."[106] SPA Section 10.01 defines Fraud to mean:

> intentional and knowing common law fraud under Delaware law in the representations and warranties set forth in this Agreement, any Contribution Agreement and the certificates delivered pursuant to Section 2.02(f)(i) and Section 2.03(d)(i). A claim for Fraud may only be made against the Party committing such Fraud. "Fraud" does not

---

[105] In addition to not being "express named Part[ies]" to the SPA, *see* SPA § 11.17(b), Defendants fall under the SPA's definition of Seller's "Affiliate." *See supra* note 100.

[106] SPA § 9.01(a).

include equitable fraud, constructive fraud, promissory fraud, unfair dealings fraud, unjust enrichment, or any torts (including fraud) or other claim based on negligence or recklessness (including based on constructive knowledge or negligent misrepresentation) or any other equitable claim.

Accordingly, through the SPA, Plaintiffs waived any fraud claims not based on the knowing falsity of a contractual representation.

## PROCEDURAL HISTORY

Plaintiffs filed their Complaint on October 24, 2023.[107] Plaintiffs' Complaint contains four causes of action[108]: common-law fraud (Counts I and II);[109] aiding and abetting fraud (Counts III and IV);[110] civil conspiracy (Counts V and VI);[111] and unjust enrichment (Counts VII and VIII).[112] One week later, AG Mobile Holdings, L.P. filed a competing suit in the Court of Chancery, which blames H.I.G.'s mismanagement for Mobileum's post-closing decline and claims that the investigation that led to this case was a predetermined farce.[113]

Returning to this action, Defendants moved to dismiss the Complaint on December 8, 2023.[114] The parties completed briefing on the motion to dismiss on

---

[107] Compl.
[108] For each cause of action, Plaintiffs bring a separate Count for Matrix Parent and the H.I.G. Plaintiffs. *Id.* ¶¶ 138–93.
[109] *Id.* ¶¶ 138–57.
[110] *Id.* ¶¶ 158–71.
[111] *Id.* ¶¶ 172–83.
[112] *Id.* ¶¶ 184–93.
[113] *See AG Mobile Hldgs., L.P. v. H.I.G. Mobile L.P.*, C.A. No. 2023-1103-MAA (Del. Ch.). A motion to dismiss is presently pending in that action.
[114] Defs.' Mot.

23

February 12, 2024.[115]  The Court heard argument on March 22, 2024.[116]  The matter is now ripe for decision.

## STANDARDS OF REVIEW

### I.  RULE 12(b)(2)

In the context of Superior Court Civil Rule 12(b)(2), "the plaintiff bears the burden of showing a basis for the trial court's exercise of jurisdiction over the nonresident defendant."[117]  At the pleading stage, a plaintiff is only required to "make a prima facie showing" of the Court's jurisdiction.[118]  While the Court draws all reasonable inferences in the plaintiff's favor, the complaint's allegations may be contradicted by affidavit.[119]

### II.  RULE 12(b)(6)

Under well-settled principles, the pivotal question under Superior Court Civil Rule 12(b)(6) is "whether the plaintiff would be entitled to recovery 'under any reasonably conceivable set of circumstances.'"[120]  The Court must "accept as true all well-pled factual allegations that provide the opposing party notice of the claim."[121]

---

[115] Pls.' Opp'n; D.I. 46 (hereinafter, "Defs.' Reply").
[116] D.I. 53 (hereinafter, "Tr.").
[117] *Wiggins v. Physiologic Assessment Servs., LLC*, 138 A.3d 1160, 1164 (Del. Super. 2016) (citations omitted).
[118] *Id.* at 1164–65 (citations omitted).
[119] *Id.* at 1165.
[120] *State ex rel. Jennings v. Monsanto Co.*, 299 A.3d 372, 381 (Del. 2023) (quoting *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011)).
[121] *Id.*

The Court must also "draw all reasonable inferences in favor of the plaintiff."[122] The Court does not, however, "accept as true conclusory allegations 'without specific supporting factual allegations.'"[123]

## ANALYSIS

### I. THE COURT LACKS A STATUTORY BASIS FOR PERSONAL JURISDICTION OVER THE INDIVIDUAL DEFENDANTS.

Delaware courts employ a "two-step analysis" to determine whether the exercise of personal jurisdiction is proper.[124] The first step is determining whether a statute provides a basis for jurisdiction over the nonresident defendant.[125] The Court then evaluates whether exercising jurisdiction comports with the Due Process Clause of the Fourteenth Amendment.[126]

Here, for the reasons expressed below, the Court finds that Plaintiffs have not made a prima facie showing of a statutory basis for jurisdiction over the Individual Defendants. A separate due process analysis is, therefore, unnecessary in this instance.[127]

---

[122] *Id.*

[123] *Page v. Oath Inc.*, 270 A.3d 833, 842 (Del. 2022) (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).

[124] *Ross v. Earth Movers, LLC*, 288 A.3d 284, 293 (Del. Super. 2023) (citing *Boone v. Oy Partek Ab*, 724 A.2d 1150, 1154 (Del. Super. 1997)).

[125] *See id.* (citing *Boone*, 724 A.2d at 1154–55).

[126] *Id.*

[127] *See Cargill, Inc. v. Rossi*, 2023 WL 6812881, at *5–6 (Del. Super. Oct. 16, 2023).

## A. The Manager-Consent Statute Does Not Provide Jurisdiction.

Plaintiffs argue that 6 *Del. C.* § 18-109 provides a statutory basis for jurisdiction over the Individual Defendants.[128]  This provision of the Delaware Limited Liability Company Act establishes that "managers" of a Delaware limited liability company (an "LLC") consent to service of process in this state—which is a basis for personal jurisdiction—with respect to claims relating to the manager's role in the LLC.[129]

In this context, "manager" can refer to either a formal manager "as defined in § 18-101"[130] or an acting manager who "participates materially in the management of the limited liability company."[131]  To qualify as an acting manager under Section 18-109(a)(ii), the individual must have "a significant role in managing an LLC or . . . play[] a significant part in an activity or event that constitutes part of the management of the LLC."[132]

---

[128]  Pls.' Opp'n at 50–53.
[129]  *See In re P3 Health Grp. Hldgs., LLC*, 285 A.3d 143, 151–52 (Del. Ch. 2022) (citations omitted).
[130]  6 *Del. C.* § 18-101(12) defines "manager" in pertinent part as "a person who is named as a manager of a limited liability company in, or designated as a manager of a limited liability company pursuant to, a limited liability company agreement or similar instrument under which the limited liability company is formed[.]"
[131]  6 *Del. C.* § 18-109(a); *In re P3 Health*, 285 A.3d at 152.
[132]  *In re P3 Health*, 285 A.3d at 153.

Delaware courts use a three-part test to determine whether a claim sufficiently relates to an LLC's business such that the LLC's manager is subject to this state's specific jurisdiction for the claim:

> An action involves or relates to the business of an LLC within the meaning of § 18-109(a) if: (1) the allegations against the manager focus centrally on his rights, duties and obligations as a manager of a Delaware LLC; (2) the resolution of the matter is inextricably bound up in Delaware law; and (3) Delaware has a strong interest in providing a forum for disputes relating to the ability of managers of an LLC formed under its law to properly discharge their respective managerial functions.[133]

Here, Plaintiffs argue that the Individual Defendants' roles at Audax and non-party Mobile GP Holdings LLC ("Mobile GP") suffice to provide a basis for jurisdiction under Section 18-109.[134] The Court disagrees.

### 1. Plaintiffs Have Not Adequately Shown that the Individual Defendants are "Managers" of Audax.

Plaintiffs contend the Individual Defendants were acting managers of Audax under Section 18-109(a)(ii).[135] Thus, Plaintiffs must show that the Individual Defendants had a significant role in the management of Audax.[136] To do so, Plaintiffs begin by listing the Individual Defendants' titles at Audax—Bhatia is a "managing director," Mack is a "partner," and Doran is a "principal."[137] But the

---

[133] *Lone Pine Res., LP v. Dickey*, 2021 WL 2311954, at *8 (Del. Ch. June 7, 2021) (quoting *Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *8 (Del. Ch. June 15, 2011)).

[134] Pls.' Opp'n at 50–51.

[135] *Id.*

[136] *See In re P3 Health*, 285 A.3d at 153.

[137] Pls.' Opp'n at 50–51.

relevant inquiry turns on the putative manager's actions with respect to the LLC, not the title such person holds.[138] Nor do Plaintiffs tie those titles—which are shared by numerous Audax employees[139]—to any specific powers or responsibilities at Audax. This argument, then, does little to show that the Individual Defendants materially participated in the management of Audax.

With respect to the Individual Defendants' activities at Audax, Plaintiffs adduce no support for the conclusion that the Individual Defendants controlled or managed Audax itself. Instead, Plaintiffs only discuss the control the Individual Defendants had over Mobileum in their roles with Audax.[140] That, however, is beside the point. As Plaintiffs recognize, Mobileum was but one of Audax's portfolio companies.[141] Managing a discrete task or project on behalf of an LLC is distinct from managing the LLC itself.[142] Were it otherwise, Section 18-109(a)(ii) could broadly apply to LLC employees who have little role in the LLC's internal governance but participate in the LLC's operations. Delaware courts have not

---

[138] *Cf. In re P3 Health*, 285 A.3d at 155–57 (holding that a person with no official role at an LLC qualified as an acting manager).

[139] *See Leadership*, AUDAX GROUP, https://www.audaxgroup.com/leadership (last visited June 27, 2024). *Cf. The Scourge of Job-Title Inflation*, THE ECONOMIST, December 8, 2022, https://www.economist.com/business/2022/12/08/the-scourge-of-job-title-inflation (explaining the growing tendency to bestow seemingly high-level titles upon a broader pool of employees).

[140] Pls.' Opp'n at 50–51.

[141] *See* Compl. ¶ 35.

[142] *See Dlayal Hldgs., Inc. v. Al-Bawardi*, 2021 WL 6121724, at *7 (Del. Ch. Dec. 27, 2021) (holding that managing some of an LLC's assets does not equate to managing the LLC for purposes of Section 18-109).

interpreted Section 18-109 in that way.[143]  Indeed, the Court of Chancery explicitly rejected the notion that "Section 18-109 applies 'when the claims alleged involve members' actions in their official capacity negotiating contracts on behalf of Delaware LLCs.'"[144]

Because Plaintiffs have alleged no facts that suggest the Individual Defendants managed Audax in any material way, Plaintiffs have not made a prima facie showing that the Individual Defendants were "managers" of Audax for purposes of Section 18-109.

### 2.  Plaintiffs' Claims Do Not Involve or Relate to Mobile GP.

Plaintiffs also suggest the Individual Defendants' roles at Mobile GP provide a basis for jurisdiction under Section 18-109.[145]  Mobile GP was the general partner of Mobile Acquisition Holdings.[146]  Mobile GP's Amended and Restated Limited Liability Company Agreement explicitly designated Bhatia and Mack as managers.[147]  Accordingly, the critical inquiry with respect to personal jurisdiction

---

[143]  *Endowment Rsch. Grp., LLC v. Wildcat Venture Partners, LLC*, 2021 WL 841049, at *5 (Del. Ch. Mar. 5, 2021) ("This court has interpreted [Section 18-109] to narrowly refer to corporate governance and the internal affairs of an LLC." (first citing *CLP Toxicology, Inc. v. Casla Bio Hldgs. LLC*, 2020 WL 3564622, at *12 (Del. Ch. June 29, 2020); and then citing *Hartsel*, 2011 WL 2421003, at *9)).

[144]  *Id.*

[145]  Pls.' Opp'n at 51.

[146]  Pls.' Opp'n, Ex. 3.

[147]  Pls.' Opp'n, Ex. 5 § 7.1.  It does not appear that Doran was a formal manager of Mobile GP. For the reasons that follow, that difference does not bear on this analysis.

via Mobile GP is whether Plaintiffs' claims "involve or relate to" Mobile GP's business.

Notably, Mobile GP went wholly unmentioned by Plaintiffs until Plaintiffs sought a basis for personal jurisdiction over the Individual Defendants. The Complaint contains counts for aiding and abetting, civil conspiracy, and unjust enrichment against an array of Audax-affiliated entities, but nowhere mentions Mobile GP. While the Court is mindful that Plaintiffs are entitled to have reasonable inferences drawn in their favor at this stage, the proposition that Plaintiffs simply overlooked Mobile GP's supposed role in this case when preparing their Complaint does not strike the Court as a reasonable inference.[148] Plaintiffs' opposition brief further reflects Mobile GP's tenuous connection to Plaintiffs' claims.

In the relevant subsection of Plaintiffs' opposition brief—labeled, "*b. Involving or relating to the [entity's] business*"[149]—Mobile GP is once again unmentioned. Instead, that subsection concludes, "the Complaint alleges that the Individual Defendants 'used their capacity as managers of [Audax Management LLC] to commit the well-pled wrongs when negotiating contracts involving the

---

[148] *Cf. BV Advisory Partners, LLC v. Quantum Computing Inc.*, 2024 WL 2723119, at \*10 (Del. Ch. May 28, 2024) (Under analogous Rule 12(b)(6) standards, "the Court should not 'accept every strained interpretation of the allegations . . . or draw unreasonable inferences in the plaintiff's favor.'" (quoting *City of Fort Myers Gen. Emps.' Pension Fund v. Haley*, 235 A.3d 702, 716 (Del. 2020))).
[149] Pls.' Opp'n at 52 (emphasis and alteration in original).

change of control of [Mobileum].' That is enough."[150] But because Plaintiffs have not shown that the Individual Defendants were Audax's managers, that is not enough.

To reiterate, Plaintiffs bear the burden to make a prima facie showing of personal jurisdiction.[151] Mentioning Mobile GP in a single sentence across both the Complaint and the opposition brief does little to carry that burden.[152]

More substantively, as already noted, Delaware courts interpret Section 18-109 "to narrowly refer to corporate governance and the internal affairs of an LLC."[153] Fraud allegedly committed by Defendants through the actions of Mobileum employees, without more, does not raise any issues related to the governance or internal affairs of Mobile GP. Nor do the allegations against the Individual Defendants "focus centrally on [the Individual Defendants'] rights, duties and obligations as [managers] of [Mobile GP]."[154] Rather, Plaintiffs' allegations against the Individual Defendants explicitly focus on the Individual Defendants'

---

[150] *Id.* at 53 (alterations in original) (citations omitted).
[151] *Wiggins*, 138 A.3d at 1164.
[152] *Cf. Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived." (citations omitted)). To be clear, the Court does not consider this issue "waived" because Plaintiffs did raise it; but the lack of substantive briefing weighs heavily against finding Plaintiffs carried their burden with respect to this argument.
[153] *Endowment Rsch. Grp.*, 2021 WL 841049, at *5 (citations omitted).
[154] *Id.* (quoting *Vichi v. Koninklijke Phillips Elecs. N.V.*, 2009 WL 4345724, at *8 (Del. Ch. Dec. 1, 2009)).

roles with the Audax Defendants.[155]   Accordingly, the Individual Defendants' positions at Mobile GP do not confer personal jurisdiction for purposes of this action.

## B. The Long-Arm Statute Does Not Provide Jurisdiction.

Plaintiffs' only other proposed basis for statutory jurisdiction is 10 *Del. C.* § 3104(c)(1).[156]   That provision establishes a basis for jurisdiction over any nonresident who "[t]ransacts any business or performs any character of work or service in the State."[157]   Section 3104(c)(1) provides only specific jurisdiction, so the plaintiff's claim must relate to the activity that satisfies the statute in order for the defendant to be subject to the Court's jurisdiction.[158]

Plaintiffs only point to the SPA-related creation of four Delaware entities (the "Matrix Entities")[159] as the transaction that triggers Section 3104(c)(1).[160] "Delaware courts have held consistently that forming a Delaware entity constitutes the transaction of business within Delaware that is sufficient to establish specific personal jurisdiction under Section 3104(c)(1)."[161]   The Matrix Entities, however,

---

[155] *See, e.g.*, Compl. ¶ 139 ("[T]he Individual Defendants (*as senior management of Audax* who oversaw the sale process) made, participated in making, or caused to be made the False Representations[.]" (emphasis added)); *Id.* ¶ 56 ("[T]he Individual Defendants . . . managed the Company *on behalf of the Audax Defendants*[.]" (emphasis added)).

[156] Pls.' Opp'n at 53–56.

[157] 10 *Del. C.* § 3104(c)(1).

[158] *Ross*, 288 A.3d at 294 (citing *Boone*, 724 A.2d at 1155).

[159] The Matrix Entities are Matrix Parent, Matrix Holdco, Inc., Matrix Topco GP, LLC, and Matrix Topco, L.P.  *See* D.I. 26 ("Levy Aff.") ¶ 9.

[160] Pls.' Opp'n at 54.

[161] *Lone Pine Res.*, 2021 WL 2311954, at *5 (citation omitted).

were created by H.I.G., not Audax or the Individual Defendants.[162] The key inquiry, then, is whether H.I.G.'s creation of the Matrix Entities can be imputed to the Individual Defendants for jurisdictional purposes. In this circumstance, the answer is no.

"As a defendant's involvement in the underlying transaction and the formation of the Delaware entity becomes more attenuated, it becomes more difficult to hold that the defendant transacted business in the state."[163] For example, in *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*,[164] the Court of Chancery held that the Dutch parent of an entity that participated in the formation of a Delaware LLC was "simply too attenuated" from the formation of the LLC to be subject to Delaware's jurisdiction on that basis.[165] The court noted that the Dutch defendant's subsidiary held only a small interest in the new LLC, and that neither the defendant nor the subsidiary controlled the LLC after it was created.[166]

The Court of Chancery followed *EBG Holdings*' reasoning in *In re Swervepay Acquisition, LLC*.[167] There, the plaintiffs alleged that a defendant "took specific fraudulent actions, which [were] the subject of [that] lawsuit, in order to effectuate

---

[162] *See* Compl. ¶ 48.
[163] *Terramar Retail Ctrs., LLC v. Marion #2-Seaport Trust U/A/D/ June 21, 2002*, 2017 WL 3575712, at *8 (Del. Ch. Aug. 18, 2017).
[164] 2008 WL 4057745 (Del. Ch. Sept. 2, 2008).
[165] *Id.* at *6.
[166] *Id.* at *6–7.
[167] 2022 WL 3701723, at *15 (Del. Ch. Aug. 26, 2022).

the [Purchase Agreement]."[168]  The plaintiffs continued that the relevant purchase agreement contemplated forming three Delaware entities, which was a jurisdiction-establishing transaction.[169]  Yet, the court concluded, "[t]his argument fails because the Seller Complaint does not allege that [the defendant] played any role in forming" the new entities.[170]  The court dismissed the defendant for a lack of personal jurisdiction.[171]

In *Mobile Diagnostic Group Holdings, LLC v. Suer*,[172] a plaintiff attempted to use the formation of a Delaware entity as part of a larger transaction as a jurisdictional hook over an individual who helped negotiate the transaction.[173]  The Court of Chancery rejected that attempt, saying, "[t]hat plaintiffs (or the Sponsors) chose to consummate the transaction using Delaware entities does not constitute an act in Delaware by [the defendant] that would subject him to personal jurisdiction under the long-arm statute."[174]  Notably, though, the defendant's participation in the negotiations was limited to provisions that affected him, not the overall structure of the transaction.[175]

---

[168]  *Id.* (third alteration in original).
[169]  *Id.*
[170]  *Id.*
[171]  *Id.*
[172]  972 A.2d 799 (Del. Ch. 2009)
[173]  *Id.* at 807.
[174]  *Id.* at 808.
[175]  *Id.* at 808–09.

The Court also notes that, generally, "when a corporation creates a Delaware entity, that action will not be attributed to the corporation's officers and directors."[176] That is true even where the director or officer "directed the corporation to take that act."[177] In contrast, where a director has a particularly close connection to the creation of a Delaware entity—for example, by proposing the creation of the new entity, becoming the founder and CEO of the new entity, and retaining a twenty percent stake in the new entity—that can suffice under Section 3104(c)(1).[178]

Guided by these principles, the Court finds that the Individual Defendants were too attenuated from the formation of the Matrix Entities to predicate jurisdiction on that transaction. There are no allegations that the Individual Defendants proposed forming the Matrix Entities in Delaware, received any personal benefit from the formation of the Matrix Entities, or took any affirmative act specific to forming the Matrix Entities. In fact, Plaintiffs' allegations say little about what role the Individual Defendants played in negotiating the SPA; Plaintiffs instead focus on the Individual Defendants' roles in preparing Mobileum for sale and the due diligence process.[179] Plaintiffs' allegations only support an inference that the

---

[176] *Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003, at *10 (Del. Ch. Oct. 31, 2013) (first citing *Hamilton Partners, L.P. v. Englard*, 11 A.3d 1180, 1201 (Del. Ch. 2010); and then citing *Ruggiero v. FuturaGene, plc*, 948 A.2d 1124, 1134 (Del. Ch. 2008)).
[177] *Ruggiero*, 948 A.2d at 1134.
[178] *See Microsoft Corp.*, 2013 WL 5899003, at *10.
[179] Separate from allegations related to due diligence, the SPA only claims that the Individual Defendants "oversaw the sale process" and "made, participated in making, or caused to be made" the Contested Representations. *See* Compl. ¶ 139. Based on those largely conclusory allegations,

Individual Defendants were aware H.I.G. would form the Matrix Entities to effect the acquisition. Such awareness, without more, is not an adequate basis for the Court to exercise personal jurisdiction over a nonresident.[180]

The citations Plaintiffs offer do not compel a different result. In the seminal case, *Papendick v. Bosch*,[181] the nonresident defendant directly formed the new Delaware entity, which readily distinguishes *Papendick* from this case.[182] The same is true of *In re P3 Health Group Holdings, LLC*[183] and *Cairns v. Gelmon*.[184] *Albert*

---

the Court accepts for present purposes that the Individual Defendants had some role in the SPA's preparation, but Plaintiffs offer no hint as to the breadth of that role. Even in their briefing, Plaintiffs only say, "Defendants negotiated terms sheets and agreements calling for the formation of new Delaware entities[.]" Pls.' Opp'n at 54. But that allegation refers to both the Individual Defendants and the Audax Defendants generally, so it sheds no light on the Individual Defendants' involvement in the SPA. These vague allegations do not support that the Individual Defendants were meaningfully involved in the decision to create the Matrix Entities. *See In re Swervepay*, 2022 WL 3701723, at *15 (noting a defendant must "participate in the formation of a Delaware entity in a meaningful fashion" for the Court to exercise jurisdiction on that basis (cleaned up) (quoting *EBG Hldgs.*, 2008 WL 4057745, at *7)).

[180] Plaintiffs' argument in this regard is reminiscent of the so-called "active-involvement theory" in the context of applying forum selection clauses to non-signatories. *See Neurvana Med., LLC v. Balt USA, LLC*, 2019 WL 4464268, at *7–8 (Del. Ch. Sept. 18, 2019). Putting aside nuances that are immaterial here, the active-involvement theory would bind a non-signatory to a jurisdiction-granting forum selection clause if the non-signatory was actively involved in the negotiation of the relevant agreement. *Id.* Replacing "forum selection clause" in that sentence with "formation of a Delaware entity" creates a fair approximation of Plaintiffs' current argument. And yet, the active-involvement theory has been squarely rejected by Delaware courts. *Id.*; *see also BAM Int'l, LLC v. MSBA Grp. Inc.*, 2021 WL 5905878, at *13–14 (Del. Ch. Dec. 14, 2021).

[181] 410 A.2d 148 (Del. 1979).

[182] *Id.* at 149 (explaining the defendant "incorporated under the laws of the State of Delaware a corporation . . . having one of its explicit purposes the function of serving as a vehicle for the [at-issue] acquisition").

[183] 2022 WL 8011513, at *5 (Del. Ch. Oct. 14, 2022) (explaining the defendant "caused [two Delaware entities] to be formed so that they could engage in the Merger at issue").

[184] 1998 WL 276226, at *1 (Del. Ch. May 21, 1998) (noting the defendants "incorporated [the Delaware entity]").

*v. Alex. Brown Management Services, Inc.*[185] similarly held that the defendants "took part in the formation of . . . two Delaware entities;"[186] and *Albert* focused more on the defendants' "day-to-day management" of the new Delaware entities.[187] So did *RJ Associates, Inc. v. Health Payors' Organization L.P.*,[188] which is the precedent *Albert* relied most heavily upon.[189]

Plaintiffs also cite the Court of Chancery's opinion in *In re General Motors (Hughes) Shareholders Litigation*.[190] There, a nonresident corporate defendant, "News," was subjected to specific jurisdiction in Delaware based on its negotiation of a merger transaction even though News did not directly engage in any acts within Delaware.[191] News did, however, have a major role in orchestrating the merger, and the merger required the filing of a Certificate of Merger in Delaware.[192] The court thus concluded:

> By negotiating and engaging in a transaction between itself, an indirect Delaware subsidiary . . . , and another Delaware corporation . . . , in which Delaware law was to be applied, and necessary acts by the parties in furtherance of that transaction would be taken in Delaware, News has "purposefully availed" itself of the laws of Delaware and should

---

[185] 2005 WL 2130607, at *14–16 (Del. Ch. Aug. 26, 2005).

[186] *Id.*

[187] *Id.*

[188] 1999 WL 550350, at *5 (Del. Ch. July 16, 1999) ("[The plaintiff] alleges more than the mere formation of the Partnership as the basis for asserting *in personam* jurisdiction over [the defendant].").

[189] *See Albert*, 2005 WL 2130607, at *15 ("The operative facts of this case, as alleged in the complaints, are similar to those in *RJ Associates*.").

[190] 2005 WL 1089021, at *22 (Del. Ch. May 4, 2005), *aff'd*, 897 A.2d 162 (Del. 2006).

[191] *Id.* at *22–23.

[192] *Id.*

have reasonably anticipated being haled into a Delaware court for a cause of action related to that transaction.[193]

The *General Motors* court emphasized the importance of Delaware providing a forum in which to vindicate violations of Delaware-imposed fiduciary duties, including claims for aiding and abetting such violations.[194]

*Suer*'s thoughtful distinction of *General Motors* resonates here.[195]  Like the defendant in *Suer*, the Individual Defendants were involved in negotiating the at-issue transaction but are not alleged to have been the driving force behind the SPA like News was for the merger at issue in *General Motors*.  The *Suer* court also explained that the "most important[]" distinction with *General Motors* is the delta between Delaware's "obligation" to provide a forum in which to remedy breaches of fiduciary duties owed to Delaware corporations and Delaware's lesser interest in hearing more ordinary civil disputes involving out-of-state parties.[196]  Where, like *Suer* and here, the aforementioned "obligation" is not present, the plaintiff's burden under Section 3104(c)(1) is heavier than that imposed in *General Motors*.[197]

---

[193]  *Id.* at *23 (footnotes omitted).

[194]  *Id.* ("Delaware has an interest in ensuring that boards of directors of Delaware corporations fulfill their fiduciary duties, an interest that would be undermined if entities that allegedly aid and abet breaches of fiduciary duties of Delaware corporations could not be held accountable in Delaware courts.").

[195]  *See Suer*, 972 A.2d at 807–09.

[196]  *Id.* at 807.

[197]  *Id.* ("Th[e] obligation to provide such a forum informed the *General Motors* Court's decision to hold that even a relatively small act in Delaware by someone other than the defendant could provide a basis for personal jurisdiction under § 3104(c)(1).").  Notably in this regard, then-Chancellor Chandler decided both *General Motors* and *Suer*.

At bottom, the Court finds that the allegations pertaining to the Individual Defendants are significantly closer to those in *Suer* than those in *General Motors*. The Individual Defendants' acquiescence to H.I.G. creating the Matrix Entities as part of Mobile Acquisition Holdings' sale of Mobileum did not amount to the Individual Defendants transacting business in Delaware. Thus, Plaintiffs' argument pursuant to Section 3104(c)(1) fails to make a prima facie showing of jurisdiction over the Individual Defendants. Since none of Plaintiffs' jurisdictional theories are availing, the claims against the Individual Defendants must be dismissed.[198]

## II.  PLAINTIFFS HAVE PLED REASONABLY CONCEIVABLE FRAUD CLAIMS.

Plaintiffs' principal claims against Defendants allege common-law fraud. The elements of common-law fraud are:

> (1) a false representation made by the defendant; (2) the defendant knew or believed the representation was false or was recklessly indifferent to its truth; (3) the defendant intended to induce the plaintiff

---

[198] Near the conclusion of Plaintiffs' jurisdictional argument at the hearing, Plaintiffs requested jurisdictional discovery for the first time. Tr. at 129:11–19. Defendants opposed that request on rebuttal. *Id.* at 141:2–18. It is well-settled that "[i]ssues not addressed in briefing, and raised for the first time during oral argument, are deemed waived." *CRE Niagara Hldgs., LLC v. Resort Grp., Inc.*, 2021 WL 2110769, at *6 n.86 (Del. Super. May 25, 2021) (quoting *Saunders v. Preholdings Hampstead, LLC*, 2012 WL 1995838, at *3 (Del. Super. May 23, 2012)). In this multi-faceted litigation, the Court expects these highly sophisticated parties to timely raise any arguments they wish to be considered; the Court will not be inclined to abide sandbagging absent a strong justification. No such justification exists for this request. In any event, Plaintiffs did not specify what discovery they would seek or how such discovery might support their claims. Accordingly, even if Plaintiffs' request were timely, it would not be sufficiently articulated. *See Chumash Cap. Invs., LLC v. Grand Mesa Partners, LLC*, 2024 WL 1554184, at *10 (Del. Super. Apr. 10, 2024) ("To obtain jurisdictional discovery, a plaintiff must articulate a good-faith reason for it that is neither futile nor the launch of a drag net fishing expedition." (internal quotation marks omitted) (quoting *Green Am. Recycling, LLC v. Clean Earth, Inc.*, 2021 WL 2211696, at *8 (Del. Super. June 1, 2021))).

to act or refrain from acting; (4) the plaintiff acted or refrained from acting in justifiable reliance on the representation; and (5) damage resulted from such reliance.[199]

Superior Court Civil Rule 9(b) heightens the pleading standard for fraud claims.[200] Pursuant to that Rule, a plaintiff must plead with particularity "the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the representation; and what that person(s) gained from making the misrepresentation."[201] In contrast, under Rule 9(b), "knowledge and other condition of mind of a person may be averred generally."[202]

"When a party sues based on a written representation in a contract . . . it is relatively easy to plead a particularized claim of fraud" because the surrounding circumstances are largely evidenced by the contract itself.[203] Therefore, once a plaintiff identifies purportedly false contractual representations, "the plaintiff need only allege facts sufficient to support a reasonable inference that the representations were knowingly false."[204]

In this Motion, Defendants primarily challenge the adequacy of Plaintiffs' pleading with regard to the knowledge element.[205] Defendants also argue that

---

[199] *Valley Joist BD Hldgs., LLC v. EBSCO Indus., Inc.*, 269 A.3d 984, 988 (Del. 2021) (citing *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 49 (Del. Ch. 2015).
[200] *Id.*
[201] *Id.* (citations omitted).
[202] *Id.* (quoting Super. Ct. Civ. R. 9(b)).
[203] *Prairie Cap.*, 132 A.3d at 62.
[204] *Id.*
[205] Defs.' Mot. at 28–41.

Plaintiffs have not satisfied Rule 9(b) with regard to the falsity element.[206] The Court reviews those arguments in turn.

### A. Plaintiffs Have Raised a Fair Inference that Defendants Knew of the Fraud.

The parties are in accord that the SPA forecloses claims of reckless fraud and only permits claims of knowing fraud.[207] This limitation is permitted under Delaware law.[208] Where the parties diverge is whether Plaintiffs have adequately pled knowing—as opposed to reckless—fraud by Defendants. The parties have effectively centered their dispute on what is required to plead knowing fraud when a contract expressly prohibits claims of reckless fraud.[209] Thus, the Court will pay particular attention to the applicable standard before applying that standard to Plaintiffs' Complaint.

### 1. *The "Position to Know" Standard Applies for Pleading Purposes.*

Plaintiffs argue they adequately pled Defendants' knowledge of the fraud because Plaintiffs' Complaint raises a reasonable inference that the falsity of the Contested Representations was knowable and Defendants were in a position to know it.[210] Defendants retort that using a "position to know" standard would be

---

[206] *Id.* at 41–42.
[207] *See* Pls.' Opp'n at 20.
[208] *See Express Scripts, Inc. v. Bracket Hldgs. Corp.*, 248 A.3d 824, 830–32 (Del. 2021) (discussing *ABRY Partners V, L.P. v. F&W Acq. LLC*, 891 A.2d 1032 (Del. Ch. 2006)).
[209] *See* Pls.' Opp'n at 23–25; Defs.' Reply at 5–14.
[210] Pls.' Opp'n at 27.

tantamount to permitting a claim for reckless fraud in contravention of the SPA.[211]

Defendants posit that Plaintiffs are required to allege facts demonstrating "Defendant[s'] actual knowledge of, or involvement in, the specific fraud [Plaintiffs] allege."[212] Contrary to Defendants' protestations, Plaintiffs accurately describe the current state of Delaware law.

As the Supreme Court of Delaware recited in one of its most recent descriptions of the pleading requirements for a fraud claim, "where pleading a claim of fraud has at its core the charge that *the defendant knew something*, there must, at least, be sufficient well-pled facts from which it can reasonably be inferred that this 'something' was *knowable* and that the defendant was *in a position to know it*."[213] This Court and the Court of Chancery—which, of course, defer to the Supreme Court—have used the same language to describe pleading knowing fraud.[214]

This standard is not a particularly recent development. The above phrasing of the position-to-know test was introduced to Delaware's jurisprudence more than two decades ago in *Iotex Communications, Inc. v. Defries*.[215] Defendants cannot

---

[211] Defs.' Reply at 7–8.

[212] *Id.* at 14.

[213] *Valley Joist BD Hldgs.*, 269 A.3d at 988 (emphasis added) (quoting *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 208 (Del. Ch. 2006)).

[214] *See Sofregen Med. Inc. v. Allergan Sales, LLC*, 2023 WL 2034584, at *11 (Del. Super. Feb. 3, 2023) (quoting *ABRY Partners*, 891 A.2d at 1050); *In re Swervepay*, 2022 WL 3701723, at *20 (quoting *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 147 (Del. Ch. 2005)).

[215] 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998) ("[W]here pleading a claim of fraud . . . that has at its core the charge that the defendant knew something, there must, at least be sufficient well-

argue that *Iotex*'s pronouncement was made in the context of recklessness. The relevant portion of *Iotex* analyzed a breach of fiduciary duty claim subject to Rule 9(b) in which "a central element . . . rest[ed] on the general allegation that [the defendant] '*knew' as a 'fact'* (and failed to disclose) something about the state of mind of [an affiliate] and others during the period of negotiation of the Agreements."[216] The word "reckless" does not appear anywhere in *Iotex*.

Defendants are, in a sense, correct that this standard draws a "distinction between the scienter element [Plaintiffs] must prove at trial (intentional fraud) and what [Plaintiffs must] allege at the motion-to-dismiss stage (mere 'position to know')."[217] Defendants are incorrect, however, that there is no justification for such a distinction. The justification lies in Delaware's "minimal" and "plaintiff friendly" pleading standard, which denies dismissal if there is even "a possibility of recovery."[218] And while Rule 9(b) raises the standard for most elements of fraud, the scienter element is explicitly exempted because Delaware law holds that "any attempt to require specificity in pleading a condition of mind would be unworkable and undesirable."[219]

---

pleaded facts from which it can reasonably be inferred that this 'something' was knowable and that the defendant was in a position to know it.").

[216] *Id.* (emphasis added).

[217] Defs.' Reply at 9.

[218] *See G-New, Inc. v. Endurance Am. Ins. Co.*, 2022 WL 4128608, at *2 (Del. Super. Sept. 12, 2022) (citations omitted).

[219] *ABRY Partners*, 891 A.2d at 1050 (quoting *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 (Del. 1993)).

In effect, the position-to-know test simply describes the allegations that make it reasonably conceivable that a defendant knew something. Stated differently, if a defendant was in a position to know a knowable fact, it is reasonably conceivable that the defendant *did know* that fact. In this way, the position-to-know test does not lower the pleading standard for knowledge, it only articulates more clearly how the ordinary reasonable conceivability standard is met.

Defendants also argue the myriad cases that apply the position-to-know test to fraud claims are inapposite because none of them dealt with contractual language expressly disclaiming reckless fraud.[220] The Court does not see that as a controlling distinction. As explained above, the position-to-know test applies to pleading knowledge, not recklessness. As such, even though alleging knowledge is contractually required in this matter, the actual element that Plaintiffs must plead is no different than in the cases that apply the position-to-know test. Accordingly, to adequately plead knowledge in this case, Plaintiffs must raise a reasonable inference that the fraud was knowable and Defendants were in a position to know about it.[221]

---

[220] Defs.' Reply at 7–8.

[221] Defendants are not the first to resist application of the position-to-know test in the context of contractual fraud. In *EMSI Acquisition, Inc. v. Contrarian Funds, LLC*, the defendants "urge[d] th[e] court to take guidance from federal securities fraud cases and adopt a more searching pleading standard that would impose a 'stringent rule for inferences involving scienter.'" 2017 WL 1732369, at *13 (Del. Ch. May 3, 2017) (footnote omitted) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)). The Court of Chancery rejected that argument and applied the position-to-know test. *Id.* at *13–14.

### 2. *It is Reasonable to Infer that Defendants were in a Position to Know about Knowable Fraud.*

Although the position-to-know test is a lower standard than particularity, the Court stresses that it is not a perfunctory analysis. To the contrary, the position-to-know test serves as a check on the broad language of "pled generally."[222] Even still, Defendants' staunch resistance to application of the position-to-know test presages their inability to dispel the inference that Defendants were in a position to know about knowable fraud. The bulk of Defendants' response to Plaintiffs' invocation of the position-to-know test is dedicated solely to the supposed inapplicability of that standard.[223] Having decided against Defendants on that threshold question, the ensuing analysis is relatively straightforward on these facts.

The Complaint alleges in detail that the Individual Defendants—who are not subject to this Court's jurisdiction but whose knowledge can nevertheless be imputed to their employers[224]—worked closely with Mobileum employees to

---

[222] *See ABRY Partners*, 891 A.2d at 1050 (citing *Albert*, 2005 WL 2130607, at *11).

[223] Defs.' Reply at 5–14.

[224] *See, e.g.*, *EMSI Acq.*, 2017 WL 1732369, at *13 (imputing employee's knowledge to their corporate employer for purposes of fraud allegations). Defendants contend that Warner's knowledge cannot be imputed to the Audax Defendants. *See* Defs.' Mot. at 33–41. Defendants make no similar argument with respect to the Individual Defendants, who are alleged to have been working directly for the Audax Defendants while managing Mobileum. Because the Court finds that it is reasonably conceivable that Defendants knew about the alleged fraud even without imputing Warner's knowledge, the Court need not decide at this stage whether Warner's knowledge can be imputed to the Audax Defendants.

prepare Mobileum for sale. In this regard, Plaintiffs allege the Individual Defendants:

> were deeply imbedded in Mobileum's day-to-day management and operation (for which they collected hefty management fees); set Mobileum's overall business and growth strategy; sourced and led diligence of Mobileum's acquisition targets; set the compensation of Mobileum's senior management; received monthly, weekly, and at times daily updates from Mobileum's senior management on their revenue recognition and acceleration schemes; set what they knew to be unrealistic revenue, earnings, and booking targets; had full access to Mobileum's internal revenue database and its customer lists; were alerted to reporting, compliance, and substantive issues with Mobileum's financial data; and led the overall sale process, including crafting narratives around Mobileum's revenue and earnings growth. Bhatia, Doran, and Mack in turn acted as directors and officers of Mobile Acquisition Holdings, LP and the Audax Defendants, who thus gained knowledge of fraudulent schemes and the falsity of the False Representatives and Warranties.[225]

This involvement was not limited to the big-picture development of Mobileum.

Plaintiffs allege, for example, that Bhatia conferred with Warner via email regarding specific cash flow estimates.[226] That conversation included Bhatia asking whether the figures were kept internal and telling Warner, "I assume [the potential buyer] will see something better."[227] The Complaint also alleges that in December 2021, Bhatia instructed Mobileum not to answer certain questions from H.I.G. about Mobileum's audited financials and gave instructions about "how to position certain

---

[225] Compl. ¶ 142.
[226] *Id.* ¶ 117.
[227] *Id.* (alteration in original).

numbers."[228]   Similarly, just days before the parties executed the SPA, Bhatia allegedly instructed Warner to lie to H.I.G. about the reason a specific booking did not generate any revenue for more than a year.[229]  Plaintiffs allege that Warner then communicated Bhatia's false explanation to H.I.G.[230]  Likewise, Srinivasan's email touting the purportedly fraudulent unbilled revenue numbers was sent to both Bhatia and Doran.[231]

As a whole, the Complaint alleges that the Audax Defendants—through Bhatia, Doran, and others—were closely involved with the preparation of Mobileum's allegedly fraudulent financials and the presentation of the same to H.I.G.[232]  Audax even allegedly came to Mobileum's aid when an accounting firm representing another potential buyer uncovered "material" problems with Mobileum's accounting practices, which led that buyer to terminate negotiations.[233]  According to Plaintiffs, Audax pressured the accounting firm to not share the firm's discovery with others and had Bhatia work with Srinivasan to "conceal the reason" that buyer walked away.[234]

---

[228]  *Id.* ¶ 120.

[229]  *Id.* ¶ 121.

[230]  *Id.*

[231]  *Id.* ¶ 78.

[232]  *See id.* ¶ 124 ("Through the Individual Defendants and others, Audax remained in constant communication with Warner and Srinivasan, collaborated with them on the presentation of key financial metrics, and signed off on their communications with H.I.G. and other potential buyers, including the contracted-for representations and warranties[.]").

[233]  *Id.* ¶ 127.

[234]  *Id.*

As Defendants emphasize, none of those allegations directly show that Defendants knew about the three pillars of alleged fraud. Those allegations do, however, suggest that Defendants were in a position to know about the three pillars of fraud if such fraud was actually occurring. That is, because Defendants were deeply ingrained in preparing Mobileum for sale, it is reasonable to infer that Defendants knew about the alleged, "pervasive" efforts to fraudulently boost Mobileum's revenue and bookings numbers.[235]

This is not a case where the plaintiffs allege that a seller should be liable for not catching the omission of "a few miscellaneous line items . . . that should have been included."[236] Defendants seek to portray the falsified timesheets, invoices, and bookings as "administrative minutiae."[237] But while such documents might be relatively insignificant when kept accurately, the decision to falsify them is hardly routine. In fact, senior Mobileum executives—including Warner—allegedly described the creation of dummy invoices as an "immediate priority" and a "top priority."[238] The priorities of senior executives cannot fairly be called "administrative minutiae."

---

[235] *See ITW Glob. Invs. Inc. v. Am. Indus. Partners Cap. Fund IV, L.P.*, 2017 WL 1040711, at *8–9 (Del. Super. Mar. 6, 2017) (explaining that "[k]nowledge in fraud cases is often proven by circumstantial evidence").

[236] *See Roma Landmark Theaters, LLC v. Cohen Exhibition Co. LLC*, 2020 WL 5816759, at *14–15 (Del. Ch. Sept. 30, 2020).

[237] Defs.' Mot. at 30.

[238] Compl. ¶¶ 75–76.

Nor is this a case like that cautioned against in *ABRY Partners*, where the seller undertook little oversight of its subsidiary and was essentially at the same risk as the buyer of being defrauded by the subsidiary's executives.[239] The evidence might bear out that Defendants were just as deceived as Plaintiffs allegedly were, if any deception occurred at all. But for now, the allegations of Defendants' assiduous management of Mobileum create a reasonable inference that Defendants would have known about widespread fraud occurring at Mobileum. For that reason, Plaintiffs' allegations of Defendants' knowledge suffice to withstand this Motion.

## B. Plaintiffs Have Raised a Fair Inference that the SPA Contained False Representations.

Defendants next argue that Plaintiffs' Complaint fails to put Defendants on notice of how the Contested Representations were false.[240] Defendants do not argue, however, that the Contested Representation could be accurate if Plaintiffs' allegations are true, which the Court must assume at this stage. This portion of Defendants' Motion does not require extensive discussion.

The Court first notes that the Court's role at this stage is not to distill the representations that can support a viable fraud claim from those that cannot; instead, the Court's task is to assess whether each aggregated claim of fraud adequately

---

[239] *See ABRY Partners*, 891 A.2d at 1062–63.
[240] Defs.' Mot. at 41.

pleads the essential elements.[241] The standard used to measure falsity at the pleading stage is whether the plaintiff's allegations "support a reasonable inference" that the at-issue representations were "materially misleading."[242]

Defendants' position that Plaintiffs' allegations of falsity are impermissibly vague is belied by the Complaint. Paragraph 107 of the Complaint contains a chart comparing side-by-side the SPA's representations and Plaintiffs' rendition of "The Truth."[243] Reproducing the full details of that chart is unnecessary in this instance because, if Plaintiffs' allegations are true, the resulting falsity of several Contested Representations would be apparent. In brief, the Contested Representations form three basic categories: (1) the material accuracy of Mobileum's financial statements, bookkeeping, and tax returns;[244] (2) Mobileum operating in the "Ordinary Course of Business" and not suffering any "Material Adverse Effects;"[245] and (3) Mobileum

---

[241] *See Cablemaster LLC v. Magnuson Grp. Corp.*, 2023 WL 8678043, at *7 (Del. Super. Dec. 5, 2023) ("Once the Court determines the claim as a whole is sound, testing the strength of every individual girder is inessential."); *but see FlexWage Sols. LLC v. Ceridian HCM Hldg. Inc.*, 2024 WL 2132620, at *7 n.119 (Del. Super. May 13, 2024) (permitting the parsing of an aggregated breach-of-contract claim where a particular defendant and an entire contract could be removed from the controversy).

[242] *LVI Grp. Invs., LLC v. NCM Grp. Hldgs., LLC* (*LVI Grp. I*), 2018 WL 1559936, at *12 (Del. Ch. Mar. 28, 2018); *accord EMSI Acq.*, 2017 WL 1732369, at *15 ("[T]he Complaint supports a pleading-stage inference that the Company intentionally misled the Buyer with respect to [an allegedly false] representation.").

[243] Compl. ¶ 107.

[244] *Id.* (citing SPA §§ 4.05(a)–(b), 4.09(b)).

[245] *Id.* (citing SPA §§ 4.06, 4.22(a)).

materially complying with all applicable laws and not subjecting Mobileum to adverse legal claims.[246]

If Plaintiffs' allegations are true, Mobileum's financial misfeasance would have necessarily involved illegitimate bookkeeping, misleading financial statements, and, likely, inaccurate tax filings. Similarly, the three pillars of alleged fraud are not indicative of the ordinary course of business, and Delaware courts have found an inference of a material adverse effect in comparable instances of internal financial manipulation.[247] Last, the falsification of financial documents—including producing backdated invoices for work that had not been performed—is inconsistent with several laws[248] and put Mobileum at risk of litigation.

In sum, Plaintiffs' allegations raise a reasonable inference that the Contested Representations were false. The Court emphasizes that Plaintiffs have yet to prove these claims, and Defendants may be able to demonstrate the truth of the Contested Representations once the pleading stage's imbalanced standards are set aside. For now, though, Plaintiffs' fraud claims survive dismissal as to the Audax Defendants.

---

[246] *Id.* (citing SPA §§ 4.12, 4.15(a)).

[247] *See EMSI Acq.*, 2017 WL 1732369, at *15 (citing *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *7–9 (Del. Ch. Nov. 19, 2013)).

[248] *See, e.g.*, 11 *Del. C.* § 871(c) ("Falsifying business records is a class A misdemeanor.").

## III. PLAINTIFFS HAVE PLED REASONABLY CONCEIVABLE CLAIMS OF AIDING AND ABETTING AND CIVIL CONSPIRACY.

Plaintiffs also bring claims for aiding and abetting fraud and civil conspiracy (together, the "Secondary Fraud Claims"). To state a claim of aiding and abetting fraud, the plaintiff must allege: "(i) underlying tortious conduct, (ii) knowledge, and (iii) substantial assistance."[249] To state a claim of civil conspiracy, the Plaintiff must allege that: "two or more persons combined or agreed with the intent to do an unlawful act or to do an otherwise lawful act by unlawful means."[250] When fraud is the underlying unlawful act, both torts fall under Rule 9(b).[251] Although these torts are distinguishable, "Delaware decisions have largely equated the two theories, noting that they often cover the same ground and that the distinctions usually are not material."[252]

In opposition to the Secondary Fraud Claims, Defendants primarily rely on SPA provisions that purport to waive any claims for conspiracy or aiding and abetting.[253] Defendants also argue that even if the Secondary Fraud Claims are not

---

[249] *RGIS Int'l Transition Holdco, LLC v. Retail Servs. Wis Corp.*, 2024 WL 568515, at \*5 (Del. Super. Feb. 13, 2024) (quoting *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at \*23 (Del. Ch. Nov. 26, 2014)).

[250] *Id.* (quoting *In re Transamerica Airlines, Inc.*, 2006 WL 587846, at \*6 (Del. Ch. Feb. 28, 2006)).

[251] *Id.* at \*5 n.60 (collecting authority).

[252] *New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 176 (Del. Ch. 2023) (citations omitted). The main difference between the two is that "[a]iding and abetting is a cause of action that focuses on the wrongful act of providing assistance, unlike civil conspiracy that focuses on the agreement." *Id.* at 177 (quoting *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt., L.P.*, 2011 WL 5314507, at \*17 (Del. Super. Nov. 2, 2011)).

[253] Defs.' Mot. at 45–47.

contractually barred, Plaintiffs have failed to adequately plead them.[254]  The Court

addresses each argument in turn.

### A. The Terms of a Fraudulently Procured Contract Cannot Exempt from Liability Entities that were Knowingly Complicit in the Fraud.

Defendants urge that SPA Section 9.01(b) prohibits Plaintiffs from bringing

the Secondary Fraud Claims.  The most relevant language reads, "no Buyer Related

Parties may avoid any limitation on liability set forth herein . . . by . . .  asserting any

claim against any Non-Recourse Party for conspiracy, [or] aiding or abetting[.]"[255]

Plaintiffs argue that such clauses are unenforceable under Delaware law when

knowing fraud is the underlying tort.[256]  Defendants respond that because the SPA

prohibits the Secondary Fraud Claims more explicitly than the non-recourse and

exclusive remedy provisions in previous cases, the Court should enforce the SPA's

plain language.[257]  For the reasons that follow, the Court finds that under Delaware

law, the terms of a fraudulently procured contract cannot exempt from liability

entities that were knowingly complicit in the fraud, including entities that aided,

abetted, or conspired to commit such fraud.

---

[254]  *Id.*
[255]   SPA § 9.01(b).  SPA § 11.17(b) also purports to broadly waive claims against the Non-Recourse Parties, which includes Defendants.  *See supra* note 105.
[256]  Pls.' Opp'n at 45–47.
[257]  Defs.' Reply at 25–27.

### 1. Guiding Precedent

The SPA's particularly precise provisions with respect to limiting fraud liability create a scenario for which neither the parties nor the Court located a perfect analogue—*i.e.*, the express disclaimer of aiding and abetting and conspiracy claims in a case alleging knowing fraud. Notwithstanding that fact, the Court is not venturing into uncharted legal territory. To the contrary, the seminal case *ABRY Partners* has been followed up with nearly two decades' worth of incremental development of the extent to which contracting parties can limit fraud liability. The Court's holding here is a natural corollary of that existing precedent.

Beginning with *ABRY Partners*, that decision has been summarized and analyzed many times before.[258] The Supreme Court, in *Express Scripts*, explained and reaffirmed *ABRY Partners*' holding.[259] The central tension that *ABRY Partners* resolved is Delaware's "especially strong" respect for freedom of contract weighed against American courts' "strong tradition" of prohibiting the contractual waiver of fraud claims.[260] To balance those competing policies, then-Vice Chancellor Strine

---

[258] *See, e.g.*, *RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 116–19 (Del. 2012); *Prairie Cap.*, 132 A.3d at 59–61; *AmeriMark Interactive, LLC v. AmeriMark Hldgs., LLC*, 2022 WL 16642020, at *5–8 (Del. Super. Nov. 3, 2022); *Online HealthNow, Inc. v. CIP OCL Invs., LLC*, 2021 WL 3557857, at *11–20 (Del. Ch. Aug. 12, 2021); *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *16–21 (Del. Super. July 29, 2021); *Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *7–8 (Del. Ch. June 11, 2020); *Roma Landmark Theaters*, 2020 WL 5816759, at *14–17.
[259] *Express Scripts*, 248 A.3d at 830.
[260] *Id.* (quoting *ABRY Partners*, 891 A.3d at 1059–60).

held that contracting parties could allocate the risk of reckless and negligent misrepresentations by waiving resulting claims, but a contracting party cannot limit its "exposure for its own conscious participation in the communication of lies to the [counterparty]."[261] In other words, if a defendant "acted with an illicit state of mind" in fraudulently procuring a contract, public policy forbids such person from using the terms of that contract to avoid liability.[262]

Importantly, as explained in *Prairie Capital*, *ABRY Partners*' holding does not only apply to the entity that directly made the false contractual representation.[263] In *Prairie Capital*, a fraud claim against a private equity fund and its managers survived a motion to dismiss because the counterclaim-plaintiff adequately alleged that those defendants knew the target company's representations were false.[264] As the Court of Chancery later recounted, "[t]he court [in *Prairie Capital*] reasoned that, although under the terms of the stock purchase agreement only the company made the representations, the scope of a claim for contractual fraud sweeps more broadly to cover those who *knew* that such representations were false."[265]

In *Online HealthNow*, then-Vice Chancellor Slights further elucidated that doctrine.[266] As relevant here, *Online HealthNow* examined the enforceability of a

---

[261] *Id.* (quoting *ABRY Partners*, 891 A.2d at 1064).
[262] *ABRY Partners*, 891 A.2d at 1064.
[263] *Prairie Cap.*, 132 A.3d at 59–61 (citations omitted).
[264] *Id.* at 61–62.
[265] *Online HealthNow*, 2021 WL 3557857, at *13 (cleaned up) (emphasis in original).
[266] *Id.* at *2.

non-recourse provision where the plaintiff alleged knowing fraud.[267]  Similarly to the SPA here, the agreement in *Online HealthNow* broadly waived claims against non-parties and said:

> "no officer, director, partner, manager, equityholder, employee or Affiliate of any Party . . . will have any liability or obligation with respect to [the SPA] or with respect to any claim or cause of action (whether in contract, tort or otherwise)" arising out of or related to the SPA "(including a representation or warranty made in connection with [the SPA] or as an inducement to enter into [the SPA])."[268]

Following an "explication *de texte*" of *ABRY Partners* and its progeny, the court in *Online Healthnow* held that "[b]ecause Plaintiff has well pled that [a non-recourse party] did, in fact, know of and facilitate the fraudulent misrepresentations in the SPA . . . [the non-recourse party] cannot invoke the non-recourse provision to avoid liability under *ABRY Partners* and its progeny."[269]

This Court, in *AmeriMark*, followed *Online HealthNow* and held:  "Public policy against fraud may defeat . . . non-recourse contractual language at the motion to dismiss stage in litigation, if the plaintiff can adequately plead that a non-signatory party was knowingly complicit when a contracting party made fraudulent representations in a contract."[270]  The *AmeriMark* court then analyzed fraud-based

---

267  *Id.*
268  *Id.* at *5 (alterations and omission in original).
269  *Id.* at *11–16, 20.
270  *AmeriMark*, 2022 WL 16642020, at *8.

aiding and abetting and conspiracy claims notwithstanding the "very broad" non-recourse provision.[271]

The Court is similarly guided by *LVI Group*.[272]  There, the Court of Chancery faced a circumstance analogous to this one.  The relevant exclusive remedy provision carved out "claims for fraud *against the Person who committed such fraud*."[273]  The court was then asked to decide whether the plaintiff could nevertheless bring a fraud-based civil conspiracy claim.[274]  The court spared the conspiracy claim from Rule 12(b)(6), initially citing ambiguity as to the application of the exclusive remedy provision.[275]  The court later confirmed that the exclusive remedy provision did not apply to fraud-based conspiracy claims and allowed those claims to proceed past summary judgment.[276]

The *LVI Group* court explained that conspiracy law attributes one conspirator's acts to each co-conspirator, so "[i]n a sense . . . all members of a conspiracy to commit fraud have 'committed such fraud,' as the [relevant

---

[271]  *Id.* at *11–13.  To address the defendants' contention that the non-recourse provision barred the aiding and abetting claim, the court in *AmeriMark* only said, "[t]he Court previously has found that the non-recourse provision does not bar claims for fraud under the circumstances presented in this case." *Id.* at *12.  The court did not mention the non-recourse provision when discussing the conspiracy claim. *Id.* at *12–13.

[272]  2018 WL 1559936, at *14.

[273]  *Id.* (emphasis added).  The Court notes that the SPA's definition of Fraud embraces a similar limitation.  *See* SPA § 10.01 ("A claim for Fraud may only be made against the Party committing such Fraud.").

[274]  *LVI Grp. I*, 2018 WL 1559936, at *14.

[275]  *Id.*

[276]  *LVI Grp. Invs., LLC v. NCM Grp. Hldgs., LLC* (*LVI Grp. II*), 2019 WL 7369198, at *29–30 n.299, 301 (Del. Ch. Dec. 31, 2019) (citations omitted).

agreement] requires. If that is correct, [plaintiff] may pursue a claim for conspiracy to defraud against the [conspiracy defendants] without running afoul of the exclusive remedies clause."[277] As noted, the court ultimately adopted that interpretation.[278]

### 2. *Application of the Established Doctrine*

Three accepted premises emerge from settled law that, when taken together, compel the Court's conclusion: (1) the critical factor under *ABRY Partners* and its progeny is the defendant's illicit mental state; (2) *ABRY Partners'* holding that contractual provisions cannot displace liability for knowing fraud does not only apply to the entity that directly made the misrepresentation; and (3) the Secondary Fraud Claims have knowing complicity as an essential element. Together, those established rules reflect that when a plaintiff adequately pleads that a defendant knowingly promoted[279] fraud, the defendant cannot shield itself from liability by relying on protections in the fraudulently procured contract.

Delaware law is clear that the Secondary Fraud Claims require an illicit mental state.[280] As this Court recently stated, "[a] civil conspiracy claim requires a plaintiff

---

[277] *LVI Grp. I*, 2018 WL 1559936, at *14.

[278] *LVI Grp. II*, 2019 WL 7369198, at *30 n.301

[279] The Court uses the term "promoted" as shorthand for the "encouragement or assistance" that can support aiding and abetting, *see Yangaroo Inc. v. Duplication Media Servs.*, 2024 WL 2791100, at *10 (Del. Super. May 30, 2024) (citation omitted), as well as the "agreement or common design" that can support civil conspiracy, *see LVI Grp. I*, 2018 WL 1559936, at *16 (citation omitted).

[280] *See RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015) ("The aider and abettor must act . . . with an 'illicit state of mind.'" (quoting *In re Oracle Corp.*, 867 A.2d 904, 931 (Del. Ch. 2004)); *LVI Grp. II*, 2019 WL 7369198, at *30 ("Conspiracy is an intentional tort[.]").

58

establish that 'two or more persons combined or agreed *with the intent* to do an unlawful act or to do an otherwise lawful act by unlawful means.'"[281]  Stated differently, "[a] plaintiff alleging civil conspiracy must . . . prove '*knowing participation*' among the conspiring partners[.]"[282]  Aiding and abetting similarly requires that the defendant "knowingly assisted" the fraud.[283]  Indeed, "[t]he most critical element for an aiding-and-abetting claim is knowing participation."[284]

There is a caveat to the above, however.  Like fraud's scienter requirement, the relevant knowledge for aiding and abetting can ordinarily be satisfied by "constructive knowledge," which entails "reckless indifference" to the truth.[285] *ABRY Partners* held that the risk of reckless fraud could fairly be allocated by contracting parties, including by waiving such claims.[286] That reasoning neatly ports to claims of reckless aiding and abetting.  Accordingly, the remainder of this discussion pertains only to aiding and abetting claims based on actual knowledge, rather than constructive knowledge, of the underlying fraud.

---

[281]  *RGIS Int'l*, 2024 WL 568515, at * 5 (emphasis added) (quoting *In re Transamerica Airlines*, 2006 WL 587846, at *6).

[282]  *Ogus v. SportTechie, Inc.*, 2023 WL 2746333, at *14 (Del. Ch. Apr. 3, 2023) (emphasis added) (quoting *Binks v. DSL.net, Inc.*, 2010 WL 1713629, at *11 (Del. Ch. Apr. 29, 2010)).

[283]  *Yangaroo*, 2024 WL 2791100, at *10; *see also Atl. NWI, LLC v. Carlyle Grp. Inc.*, 2022 WL 15800272, at *1 (Del. Ch. Oct. 28, 2022) (explaining aiding and abetting "requires a defendant's knowing assistance").

[284]  *Principal Growth Strategies, LLC v. AGH Parent LLC*, 2024 WL 274246, at *10 (Del. Ch. Jan. 25, 2024).

[285]  *See RBC Cap. Mkts.*, 129 A.3d at 862 (citations omitted).

[286]  *ABRY Partners*, 891 A.2d at 1064 n.82.

The Court now turns to the other two premises. *ABRY Partners'* well-established holding is based upon the "moral difference between a lie and an unintentional misrepresentation" as well as the "practical difference between lies and unintentional misrepresentations."[287] The moral difference justifies courts' reluctance "to enforce contracts excusing liars for responsibility for the harm their lies caused."[288] The practical difference explains the legitimate basis to disclaim reckless misrepresentations—namely, risk allocation—that is absent in the context of knowing misconduct.[289] Those factors similarly apply to the Secondary Fraud Claims.

Morally, abettors and conspirators make the choice to promote tortious conduct that causes harm to third parties. Neither justice nor social norms are served by enabling bad actors to make that choice without fear of legal repercussions. Practically, the scienter element of the Secondary Fraud Claims already protects from liability those who inadvertently assist or act alongside fraudsters.[290] Thus, even in the absence of contractual protection, an actor can confidently avoid liability

---

[287] *Id.* at 1062.

[288] *Id.*

[289] *Id.*

[290] *Cf. In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *41 (Del. Ch. Aug. 27, 2015) ("Because the involvement of secondary actors in tortious conduct can take a variety of forms that can differ vastly in their magnitude, effect, and consequential culpability, the element of 'knowing participation' requires that the secondary actor have provided 'substantial assistance' to the primary violator." (citation omitted)).

for Secondary Fraud Claims simply by declining to promote fraud.[291] As in *ABRY Partners*, those considerations counsel against permitting the contractual waiver of the Secondary Fraud Claims.

The Court also finds important Delaware courts' refusal to narrowly apply *ABRY Partners* to the party that made the misrepresentation. Instead, "as a matter of public policy, the scope of a claim for contractual fraud swe[eps] more broadly."[292] To that end, anyone who causes another to make a knowingly false representation can also be liable as a principal fraudster.[293] Of course, the Secondary Fraud Claims are only necessary to hold liable those who are not principal fraudsters. Still, the Court sees substantial overlap in the wrongfulness of causing another to make a false statement and the wrongfulness of either substantially assisting or agreeing to another making a false statement. In each circumstance, the actor is consciously participating in a course of conduct that leads to someone else defrauding a third party. The shared culpability of secondary tortfeasors is reflected

---

[291] The Court recognizes, as did *ABRY Partners*, that there remains the unfortunate risk of judicial error or uncompensated costs from successfully defending a claim. 891 A.2d at 1062. But, as *ABRY Partners* concluded, that risk does not justify broadly sanctioning the conscious promotion of fraud. The Court also notes that the risk of uncompensated litigation costs can be effectively mitigated by a contractual fee-shifting provision. *See Bako Pathology LP v. Bakotic*, 288 A.3d 252, 280–81 (Del. 2022) (explaining that "'prevailing party' clauses" provide a viable exception to the American Rule).

[292] *Prairie Cap.*, 132 A.3d at 60.

[293] *Id.* at 59–61. Specifically, a defendant can be liable "if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction." *Id.* at 59 (quoting Restatement (Second) of Torts § 533 (1977)).

61

by the law's willingness to hold them jointly and severally liable for the underlying tort.[294]

Finally, although these parties invited a detailed analysis of this issue, the Court reiterates that this is not a new rule. Rather, this conclusion merely follows the holdings in *AmeriMark* and *LVI Group*. The only difference here is that the SPA's attempt to preclude secondary liability was more explicit than in past cases. But the non-recourse provision in *AmeriMark* waived as to non-parties, "all claims, obligations, liabilities, or cause[s] of action (whether in Contract or in tort, in law or in equity)" connected to the relevant agreement.[295] That "very broad" language putatively barred aiding and abetting and civil conspiracy claims, but such claims were nevertheless permitted.[296] Likewise, given *LVI Group*'s holding that "all members of a conspiracy to commit fraud have committed that fraud,"[297] allowing co-conspirators to contractually avoid fraud liability would conflict with *ABRY Partners*. Accordingly, this result is not merely aligned with *ABRY Partners*' culpability-focused reasoning, it is commanded by more recent developments of that doctrine.

---

[294] *See In re Columbia Pipeline Grp., Inc. Merger Litig.*, 299 A.3d 393, 481 n.38 (Del. Ch. 2023) (collecting sources); *KT4 Partners LLC v. Palantir Techs. Inc.*, 2021 WL 2823567, at *31 (Del. Super. June 24, 2021) (citing *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009)).

[295] *AmeriMark*, 2022 WL 16642020, at *2.

[296] *Id.* at *2, 11–13.

[297] *LVI Grp. II*, 2019 WL 7369198, at *30 n.301 (citation omitted).

## B. Plaintiffs Adequately Pled the Secondary Fraud Claims.

Plaintiffs' aiding and abetting and civil conspiracy claims are legally distinct, but they are so closely related that the Court analyzes them together.[298] Additionally, aside from the SPA's exclusive remedy and non-recourse provisions, Defendants rely almost exclusively on the supposed defectiveness of Plaintiffs' principal fraud claims to defeat the Secondary Fraud Claims. Since the Court has already explained that the SPA does not bar these claims and Plaintiffs' principal fraud claims are well-pled, there is not much left to discuss. In the interest of completeness, the Court will briefly address the elements.

The first two elements of aiding and abetting—*i.e.*, Defendants' knowledge of an underlying tort[299]—have already been addressed at length. For the reasons stated in Section II of this Analysis, Plaintiffs have raised a reasonable inference that Defendants knew certain representations in the SPA were false. The only remaining element is Defendants' substantial assistance of the fraud.[300]

Aiding and abetting's third element requires the plaintiff to show that "the abettor's 'encouragement or assistance [wa]s a substantial factor in causing the resulting tort.'"[301] As noted above, Plaintiffs allege that the Individual Defendants,

---

[298] *See New Enter. Assocs.*, 292 A.3d at 176–77.
[299] *See RGIS Int'l*, 2024 WL 568515, at *5.
[300] *Id.*
[301] *Yangaroo*, 2024 WL 2791100, at *10 (quoting *In re Oracle Corp. Deriv. Litig.*, 2020 WL 3410745, at *11 (Del. Ch. June 22, 2020)).

working on behalf of the Audax Defendants, encouraged the fraud by "set[ting] what they knew to be unrealistic revenue, earnings, and bookings targets."[302]  Plaintiffs also allege that the Audax Defendants employees, including the Individual Defendants, "collaborated with [Mobileum] on the presentation of key financial metrics, and signed off on [Mobileum's] communications with H.I.G. and other potential buyers, including the contracted-for representations and warranties."[303]  Audax also allegedly "attempted to leverage its influence in the private equity industry" to convince an accounting firm to withhold from potential buyers a report that documented "material issues" with Mobileum's accounting practices.[304]  The Court thus finds it reasonably conceivable that Defendants' encouragement and assistance was a substantial factor in causing the fraud.

The conspiracy claim is essentially satisfied by the same conduct.  As Vice Chancellor Glasscock has explained:

> it seems likely . . . that civil conspiracy is, in many cases, to borrow a term, a "lesser-included" claim within an aiding and abetting claim; an "agreement" and act in furtherance does not necessarily rise to the level of "*substantial* assistance," while "substantial assistance," if shown, normally includes an "agreement," even if implicit, and act in furtherance thereof.[305]

---

[302] Compl. ¶ 142.
[303] *Id.* ¶ 124.
[304] *Id.* ¶ 127.
[305] *Great Hill Equity Partners*, 2014 WL 6703980, at *22 (emphasis in original).

The Vice Chancellor continued, "[i]t is not clear to me that—in the fraud context . . . —a litigant would be likely to show aiding and abetting without incidentally having shown the elements of civil conspiracy were satisfied."[306]  This is not the unlikely case.  The allegations that raise an inference of substantial assistance also provide sufficient circumstantial evidence to reasonably infer that the Audax Defendants conspired to perpetrate a fraud.[307]  Therefore, the Court will not dismiss the Secondary Fraud Claims.[308]

## IV.    PLAINTIFFS' UNJUST ENRICHMENT CLAIMS ARE BARRED BY THE SPA.

Plaintiffs also bring claims for unjust enrichment.  "To plead unjust enrichment, a plaintiff must show: '(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, [and] (4) the absence of justification.'"[309]  As with the Secondary Fraud Claims, Defendants argue this cause of action is barred by the SPA and the underlying fraud is not well pled.[310]  Plaintiffs likewise resume their argument that a well-pled claim of knowing fraud defeats

---

[306]  *Id.*; *see also New Enter. Assocs.*, 292 A.3d at 176–77 ("Our cases have viewed aiding and abetting as the larger, more encompassing theory [compared to conspiracy.]" (citations omitted)).

[307]  *See LVI Grp. II*, 2019 WL 7369198, at *30 ("[A] claim for conspiracy can rely on circumstantial evidence from which a reasonable factfinder can conclude there was an agreement." (citing *In re Am. Int'l Grp., Inc.*, 965 A.3d 763, 806 (Del. Ch. 2009))).

[308]  The Court notes that Defendants did not argue that the Secondary Fraud Claims are duplicative of each other.  *Cf. Great Hill Equity Partners*, 2014 WL 6703980, at *24.  As previously noted, the Court declines to consider arguments that the parties did not raise.  *See supra* note 198.

[309]  *Chumash Cap. Invs.*, 2024 WL 1554184, at *14 (alteration in original) (quoting *CFGI, LLC v. Common C Hldgs. LP*, 2023 WL 325567, at *6 (Del. Super. Jan. 29, 2024)).

[310]  Defs.' Mot. at 47–49.

contractual limitations on liability.[311] Defendants' contractual argument is availing with respect to this cause of action.

As relevant here, the exclusive remedy provision in SPA Section 9.01(b) waives all claims except those for "Fraud."[312] The SPA's definition of Fraud expressly excludes claims of "unjust enrichment."[313] Defendants also raise language in SPA Sections 9.01(b) and 11.17(b) that purports to preclude liability "based on . . . the ownership or operation of the Acquired Companies prior to the Closing[.]"[314] These provisions unambiguously waive claims against Defendants for unjust enrichment, so Plaintiffs' claims are only viable if public policy renders this aspect of the SPA unenforceable.[315]

---

[311] Pls.' Opp'n at 48.

[312] SPA § 9.01. The SPA retained certain other narrow categories of claims that are impertinent here. *Id.*

[313] SPA § 10.01.

[314] Defs.' Mot. at 48 (citing SPA §§ 9.01(b), 11.17(b)).

[315] The Court notes that SPA Section 11.15 lists Audax and the Seller Related Parties as third-party beneficiaries with the ability to enforce the non-recourse provision and other provisions of the SPA. *Cf. LVI Grp. I*, 2018 WL 1559936, at *14, 17 (permitting unjust enrichment claim to survive dismissal where defendants' ability to enforce the exclusive remedy provision was in doubt). Also, Plaintiffs do not seek rescission of the SPA or otherwise argue that the SPA is wholly invalid. *Cf. S'holder Representative Servs. LLC v. RSI Holdco, LLC*, 2019 WL 2207452, at *6 (Del. Ch. May 22, 2019) ("Because [plaintiffs] have challenged the validity of the Merger Agreement, the Merger Agreement does not preclude the unjust enrichment claim from proceeding (footnote omitted) (citing *JCM Innovation Corp. v. FL Acq. Hldgs., Inc.*, 2016 WL 5793192, at *7 (Del. Super. Sept. 30, 2016))). Defendants, for their part, do not contend that their relationship with Plaintiffs is comprehensively governed by the SPA. *Cf. CFGI, LLC*, 2024 WL 325567, at *7 (dismissing portion of an unjust enrichment claim that was "entirely cover[ed]" by an enforceable contract). Thus, this case presents an unusual circumstance where non-signatories to a valid agreement can enforce the agreement to oppose a fraud-related unjust enrichment claim that is not precluded by the mere existence of the agreement.

Similarly to the Secondary Fraud Claims, neither the parties nor the Court located an exact precedent for this circumstance.[316] Plaintiffs cite *Online HealthNow*, which allowed past the pleading stage an unjust enrichment claim that was ancillary to a contractual fraud claim.[317] But in *Online HealthNow*, the defendants did not argue that the contract directly barred unjust enrichment; instead, the defendants only argued the agreement "bar[red] Plaintiffs' predicate claim for fraud."[318] The *Online HealthNow* court therefore did not separately consider the agreement's effect on unjust enrichment or other ancillary fraud-based claims.[319] This case is also unlike the circumstances in *Chumash Capital Investments*, where the language of an exclusive remedy provision's fraud exception was broad enough to encompass unjust enrichment.[320]

The Court thus returns to the guiding precedent detailed in Section III.A of this Analysis. As previously discussed, Delaware's "especially strong" respect for freedom of contract only yields to contractually prohibited fraud claims where the

---

[316] The Court suspects this may be due, at least in part, to the atypical scenario of this case described in the preceding footnote. *See supra* note 315.

[317] Pls.' Opp'n at 48 (citing *Online HealthNow*, 2021 WL 3557857 at *19–20).

[318] *Online HealthNow*, 2021 WL 3557857, at *20.

[319] *Id.* ("Having now rejected [the argument against the predicate fraud claim], for reasons explained, Defendants' motion to dismiss Counts II–IV must be denied.").

[320] *Chumash Cap. Invs.*, 2024 WL 1554184, at *15 (analyzing the language "nothing in [the relevant portion of the agreement] shall limit . . . any Person's right to seek *any remedy on account of Actual Fraud*" (emphasis and omission in original)); *accord bioMérieux, Inc. v. Rhodes*, 2024 WL 2076661, at *10 (Del. Super. May 9, 2024) (noting "claims *arising from* Fraud" is broader than "claims of Fraud" or "claims for Fraud" (emphasis in original)).

defendant acted with an "illicit state of mind."[321]  And similar public policy exceptions to the enforceability of contracts "are not to be lightly found."[322] Accordingly, and as discussed more fully above, a scienter element is necessary for *ABRY Partners'* rationale to apply.  Unjust enrichment has no such element.

"As the Delaware Supreme Court has stated, '[r]estitution serves to deprive the defendant of benefits that in equity and good conscience he ought not to keep, *even though he may have received those benefits honestly* in the first instance[.]'"[323] For that reason, "[r]estitution is permitted even when the defendant retaining the benefit is not a wrongdoer."[324]  In fact, unjust enrichment has been permitted alongside fraud claims specifically because unjust enrichment can reach defendants who were *not* implicated in the fraud.[325]

Because unjust enrichment can force disgorgement from "innocent" parties,[326] the public policy concerns addressed by *ABRY Partners* do not apply to

---

[321] *ABRY Partners*, 891 A.2d at 1059, 1064.
[322] *Id.* at 1060 n.66 (citation omitted).
[323] *RSI Holdco, LLC*, 2019 WL 2207452, at *7 (emphasis added) (first alteration in original) (quoting *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999)).
[324] *Id.* (citing *Schock*, 732 A.2d at 232).
[325] *Great Hill Equity Partners*, 2014 WL 6703980, at *28 ("[A]ssuming the Plaintiffs can prove that the Moving Defendants profited, and the Plaintiffs were impoverished, as the result of the non-moving Defendants' fraud; and assuming that Plaintiffs are unable to implicate the Moving Defendants in that fraud, unjust enrichment would be invoked."); *see also LVI Grp. I*, 2018 WL 1559936, at *17.  The requirement of the absence of a remedy at law discussed in *Great Hill Equity Partners* and *LVI Group I* is no longer an element of unjust enrichment claims brought in Superior Court or pursuant to the Court of Chancery's clean-up jurisdiction.  *See Monsanto*, 299 A.3d at 391.
[326] *Great Hill Equity Partners*, 2014 WL 6703980, at *28.

this quasi-contractual claim. Accordingly, in this circumstance,[327] the SPA's plain language will be enforced, and Plaintiffs' unjust enrichment claims are dismissed.

## V. THE COURT WILL PERMIT ADDITIONAL BRIEFING ON DEFENDANTS' MOTION TO STRIKE.

The Court chooses to permit additional briefing on the issue of Defendants' Motion to Strike Plaintiffs' jury demand. Compared to the more pressing issues addressed herein, the effect of the SPA's jury waiver provision on this group of parties received sparse attention from the litigants. Of the attention this issue did receive, most of it was spent debating the procedural propriety of raising an argument in a footnote. The Court believes a more substantive discussion of this issue is worthwhile before a decision is rendered. The parties shall therefore propose a briefing schedule and a word limit that is less than that provided by Rule 107(h)(1) to better address the impact of the SPA's jury waiver provision on this litigation.

---

[327] *See supra* note 315.

## CONCLUSION

In conclusion, Defendants' Motion to Dismiss Plaintiffs' Complaint is **GRANTED** as to the Individual Defendants and Counts VII and VIII, but **DENIED** in all other respects. The parties are instructed to submit a proposed briefing schedule for Defendants' Motion to Strike by July 19, 2024.

**IT IS SO ORDERED.**

/s/ Meghan A. Adams

Meghan A. Adams, Judge